UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------

JACQUELINE AGUIRRE,

        Plaintiff,    **MEMORANDUM & ORDER**
                10-CV-5914 (MKB)

    v.

BEST CARE AGENCY, INC., DOROTHY DE
CASTRO, and PERLITA JORDAN,

        Defendants.

-----------------------------------------------------------------

MARGO K. BRODIE, United States District Judge:

    Plaintiff Jacqueline Aguirre brings the above-captioned action against Defendants Best

Care Agency, Inc. ("Best Care"), Dorothy De Castro and Perlita Jordan, alleging (1) forced labor

in violation of the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C.

§ 1589 and § 1595; (2) trafficking with respect to involuntary servitude and forced labor in

violation of TVPRA, 18 U.S.C. § 1590 and § 1595; (3) fraudulent inducement; and (4) negligent

misrepresentation.[1]  Defendants counterclaimed for defamation.  Plaintiff has moved for

summary judgment on her four claims and Defendants' counterclaim.  Defendants have moved

for judgment on the pleadings as to De Castro and Jordan.  For the reasons set forth below,

Plaintiff's motion for summary judgment as to Plaintiff's claims is denied but granted as to

Defendants' counterclaim.  Defendants' motion for judgment on the pleadings is denied.

  **I.  Background**

    Plaintiff was born in the Philippines and lived there from 1964 to 2000.  (Pl. Dep. 8:6–10,

22–25.)  Plaintiff obtained a Bachelor of Science degree in Accounting in the Philippines.  (Pl.

---

    [1]  Plaintiff also alleged claims for negligent infliction of emotional distress, *quantum meruit*, unjust enrichment and conspiracy in the Complaint.  Plaintiff has since withdrawn those claims.  (Pl. Mem. 1.)

56.1 ¶ 2; Defs. 56.1 ¶ 2.)  On March 26, 2000, Plaintiff entered the United States on a tourist visa.  (Pl. 56.1 ¶ 1; Defs. 56.1 ¶ 1; Pl. Dep. 8:20–21, 16:18–24.)  Plaintiff visited an employment agency and met De Castro and Jordan, who represented themselves as the owners of Best Care, a nursing employment agency.  (Pl. 56.1 ¶ 3; Defs. 56.1 ¶ 3.)  According to Plaintiff, De Castro and Jordan "agreed to offer Plaintiff employment and H-1B immigration sponsorship so that Plaintiff could help them in the day-to-day operations of their nursing employment agency, more specifically on the accounting side of Best Care's business operations."[2]  (Pl. 56.1 ¶ 4; *see* Pl. Dep. 31:8–33:4, 39:5–11, 54:7–9, 73:14–18.)  De Castro and Jordan admit that they "agreed to help" Plaintiff with her H-1B visa but claim that they hired Plaintiff to perform "secretarial [-] related matters."  (Defs. 56.1 ¶ 4.)

### a. H-1B Visa and Application Procedure

An H-1B visa is a temporary worker visa available to those who work in a specialty occupation.  *See* 8 C.F.R. § 214.2(h)(1)(ii)(B).  An H-1B visa grants a "nonimmigrant alien" admission to the United States for an initial period of no more than three years.  8 C.F.R. § 214.2(h)(9)(iii)(A)(1).  The visa may be extended for a period of three years, but an individual may not remain in the United States on an H-1B visa for more than a total of six years, unless the alien has an approved or pending labor certification application for at least one year.  8 C.F.R. § 214.2(h)(15)(ii)(B)(1); American Competitiveness in the Twenty-First Century Act of 2000, Pub. L. No. 106–313, § 106(a), 114 Stat 1251, 1254–55 (2000); *Adusumelli v. Steiner*, 740 F.

---

[2]  During her deposition, Plaintiff stated that she was told that De Castro was looking for a secretary and that De Castro told Plaintiff when they first met that she needed a secretary.  (Pl. Dep. 29:23–31:9.)  Plaintiff claims she told De Castro and Jordan that she could not work as a secretary because she only had a tourist visa and needed someone to sponsor her, and De Castro and Jordan agreed to sponsor her to obtain an H-1B visa.  (*Id*. at 31:8–33:4, 54:7–9, 73:14–18, 78:2–25.)

Supp. 2d 582, 586 (S.D.N.Y. 2010), *aff'd sub nom. Dandamudi v. Tisch*, 686 F.3d 66 (2d Cir. 2012).

In order for an employee to obtain an H-1B visa, an employer must file a labor condition application with the United States Department of Labor ("Labor Department") and have it certified by the Labor Department.  20 C.F.R. § 655.700(b).  After obtaining Labor Department certification of a labor condition application, the employer may submit a nonimmigrant visa petition with the labor condition certification application to the United States Department of Homeland Security ("DHS") and request an H-1B visa classification for the nonimmigrant worker.  *Id.*  If DHS approves the H-1B visa classification, the nonimmigrant worker may apply for an H-1B visa abroad, or, if the nonimmigrant is already in the United States, for a change of visa status.  *Id.*

An individual may apply for a green card or "legal permanent resident" status, while working in the United States with an H-1B visa.  *See Adusumelli*, 740 F. Supp. 2d at 586–87 n.3 (explaining why individuals "may maintain their temporary status while simultaneously manifesting an intent to remain in the country permanently by applying to become" legal permanent residents).  If an H-1B immigrant's maximum period of stay expires while she is waiting for a green card determination, permission to work is extended until the green card determination is made, even though the maximum term of the H-1B visa has expired.  *See* 8 C.F.R. § 274a.12(c)(9); *see also Adusumelli*, 740 F. Supp. 2d at 586–87.

**b.  Plaintiff's H-1B Employment Applications**

In early February 2001, Neil A. Weinrib was retained to prepare the H-1B visa petition for Plaintiff.  (Pl. 56.1 ¶ 5; Defs. 56.1 ¶ 5.)  On February 5, 2001, De Castro signed a labor condition application and a nonimmigrant visa petition on behalf of Plaintiff.  (Pl. 56.1 ¶¶ 6–7;

Defs. 56.1 ¶¶6–7; *see* Pl. Ex. 19.)  In the labor condition application, Best Care proposed to hire

Plaintiff as an accounting consultant for at least $19 per hour.  (Pl. 56.1 ¶ 6; Defs. 56.1 ¶ 6; Pl.

Ex. 19.)  In the nonimmigrant visa petition, Best Care proposed to hire Plaintiff as an accounting

consultant for 18 hours each week at $18,700 each year.  (Pl. 56.1 ¶ 7; Defs. 56.1 ¶ 7; Pl. Ex.

19.)  According to Defendants, De Castro was told to sign the petition documents and did so

after Plaintiff and Weinrib forwarded the documents to her.  (Defs. 56.1 ¶ 6.)  Defendants claim

Best Care "signed documents calling Plaintiff an 'accounting consultant' for immigration

purposes at Plaintiff's request."[3]  (Defs. 56.1 ¶ 7.)  In April 2001, Legacy INS[4] approved

Plaintiff's petition for an H-1B visa for the period of April 26, 2001 to March 15, 2004.  (Pl. 56.1

¶ 8; Def. 56.1 ¶ 8; Pl. Ex. 22.)

    According to Plaintiff, after the H-1B visa approval, "De Castro and Jordan required

Plaintiff to perform, not only accounting-related responsibilities, but mostly other office-related

operational responsibilities in connection with Best Care's staffing business."  (Pl. 56.1 ¶ 9.)

Defendants, "[k]nowing that Plaintiff would become unlawfully present in the United States if

they withdrew the H1B petition," took advantage of their sponsorship of her "by paying her less

than what they promised the U.S. Department of Labor and Legacy INS, and made her perform

office functions not related to her [a]ccounting [c]onsultant position."  (Pl. 56.1 ¶ 10.)  Plaintiff

---

[3]  In order to qualify for an H-1B visa, Plaintiff had to be a member of a specialty occupation.  8 U.S.C. § 1101(a)(15)(H)(i)(b); *see also* 20 C.F.R. § 566.700(a).

[4]  The agency formerly known as the United States Immigration and Naturalization Service has ceased to exist and is now referred to as Legacy INS.  Most of the functions of Legacy INS were transferred in 2003 to three entities within DHS: the U.S. Citizenship and Immigration Service ("USCIS"), the U.S. Immigration and Customs Enforcement, and the U.S. Customs and Border Protection.  *See U.S. Immigration and Naturalization Service — Populating a Nation: A History of Immigration and Naturalization*, U.S. CUSTOMS AND BORDER PROTECTION, http://www.cbp.gov/xp/cgov/about/history/legacy/ins_history.xml (last visited August 15, 2013).

felt that if she did not operate "the way [Defendants] want[ed her] to function, they [would] withdraw [her] sponsorship," and she would lose her status and be deported.  (Pl. Dep. 66:3–6; 71:12–16.)

Plaintiff was initially paid $8 per hour and required to work 40 hours each week.  (Pl. 56.1 ¶ 10.)  She was not happy with her initial wages, but accepted the position with Best Care because they offered to sponsor her to obtain her H-1B visa.  (Pl. Mem. 3; Pl. Dep. 44:24– 45:18.)  Plaintiff did not initially object to her rate of pay, but after the H-1B visa was approved, she objected to both De Castro and Jordan.  (Pl. Dep. 45:19–46:21.)  In addition to objecting to her inadequate pay, Plaintiff also objected to her supplemental office duties.  (Pl. 56.1 ¶ 11.)  De Castro and Jordan responded by offering to sponsor Plaintiff for her green card, and told her that she would receive the wage set forth in her immigration documents as soon as she received her green card.  (Pl. Mem. 3; Pl. 56.1 ¶ 12; Pl. Decl. ¶ 14.)  De Castro and Jordan "told her that if she did not like the work-pay arrangement, they could simply discontinue or withdraw their H1B sponsorship."  (Pl. 56.1 ¶ 12.)  Fearing the withdrawal by Defendants of the nonimmigrant visa petition, Plaintiff "felt compelled to agree to Defendants' proposals, and continued to work for them at a much lesser compensation rate than required by law."  (Pl. 56.1 ¶ 13.)

According to Defendants, Plaintiff was hired to perform secretarial related tasks, which she performed throughout her employment, for a standard 40-hour workweek.  (Defs. 56.1 ¶¶ 4, 9, 10.)  At Plaintiff's request, they signed immigration documents referring to her as an "accounting consultant" for immigration purposes.  (Defs. 56.1 ¶ 7.)  In addition, Plaintiff "insisted" that they not pay her the wage set forth in the immigration documents.  (Defs. 56.1 ¶ 11.)  Moreover, Defendants never threatened to discontinue Plaintiff's immigration sponsorship.  (Defs. 56.1 ¶¶ 11–12, 69.)  "No one from Best Care Agency, Inc. had ever

threatened to call the authorities on Plaintiff, and it was Plaintiff, herself, who wanted to say that she was being [paid] the proffered wage when she clearly never expected to be." (Defs. 56.1 ¶ 13.) In their signed declarations, De Castro and Jordan stated that they "never threatened to stop Best Care's petition on behalf of Plaintiff if she did not continue to work at her current salary" and "[t]here was no scheme to have Plaintiff continue working for Best Care at a lower salary [than] what she believed she was entitled to." (De Castrro Decl. ¶ 19; Jordan Decl. ¶ 21.)

In March 2004, De Castro signed the necessary documents prepared by Weinrib on Plaintiff's behalf to obtain an extension of the H-1B visa. (Pl. 56.1 ¶ 15; Defs. 56.1 ¶ 15.) The documents were submitted to United States Citizenship and Immigration Services ("USCIS"), and the H-1B visa was extended for the period of April 2004 to March 15, 2007. (Pl. 56.1 ¶¶ 14–15, 17; Defs. 56.1 ¶¶ 14–15, 17.) Plaintiff claims that by signing these documents, Best Care, through De Castro, "certified to the USCIS that it was extending Plaintiff's nonimmigrant working status as it needed her services as an [a]ccounting [c]onsultant," and proposed to pay Plaintiff a salary of $400 for a 20-hour workweek, or $20 for each hour worked. (Pl. 56.1 ¶ 16.) Defendants assert that Best Care "continued to allow Plaintiff to indicate that she was an [a]ccounting [c]onsultant, and was being paid accordingly, at Plaintiff's own request." (Defs. 56.1 ¶ 16.) De Castro admitted that she signed Plaintiff's immigration documents under penalty of perjury that the information was true and correct, and that the immigration documents listed higher rates of pay than Plaintiff's actual rates of pay and stated that Plaintiff was offered the position of "accounting consultant." (De Castro Dep. 145:10–154:23.) De Castro claims that Plaintiff specifically told her that the hourly wage listed on the visa application "was merely a number to put on the form and that she did not expect this amount to be paid to her." (De Castro

6

Decl. ¶ 13.)  "Best Care continued the sponsorship at Plaintiff's request because they felt bad for Plaintiff and her current immigration situation."  (De Castro Decl. ¶ 14.)

On February 27, 2007, De Castro signed the necessary immigration documents to request a second extension of Plaintiff's H-1B visa, indicating that Best Care was paying Plaintiff the standard wage for an accounting consultant.  (Pl. 56.1 ¶ 25; Defs. 56.1 ¶ 25.)  In April 2007, USCIS approved the extension of Plaintiff's H-1B visa for the period of March 2007 to April 25, 2008.  (Pl. 56 ¶ 26; Defs. 56.1 ¶ 26.)

### c.  Plaintiff's Green Card Application Process

On August 22, 2001, Defendants submitted an application to the Labor Department for an alien employment certification on behalf of Plaintiff.  (Pl. 56.1 ¶ 14; Defs. 56.1 ¶ 14.)  This was the first step in Plaintiff's green card application process.  (Pl. 56.1 ¶ 14.)  Plaintiff continued working for Best Care under her H-1B visa, which was valid until March 2004, and subsequently extended for the period of April 2004 to March 15, 2007, and then for one additional year from March 2007 to April 25, 2008.  (Pl. 56.1 ¶¶ 14–17, 26; Defs. 56.1 ¶ ¶ 14–17, 26; Pl. Ex. 22.)

In June 2006, the Labor Department required Best Care to confirm whether it was still interested in processing Plaintiff's alien employment certification.  (Pl. 56.1 ¶ 18; Defs. 56.1 ¶ 18.)  According to Plaintiff, during that same month, De Castro and Jordan discussed with Plaintiff possibly withdrawing her alien certification application, as well as their sponsorships of her H-1B visa, if they did not "receive Plaintiff's assurance that she would continue working for them until two years after she receives her green card approval."  (Pl. 56.1 ¶ 19.)  During this discussion, Plaintiff inquired of De Castro and Jordan whether Best Care had the financial capability to pay her the wage represented in her immigration documents until the approval of her green card application, and "reminded them that they were not paying her the prevailing

wage pursuant to the attestations and promises they submitted to the Labor Department and to

Legacy INS [and/or] USCIS."  (Pl. 56.1 ¶ 20.)  Jordan assured Plaintiff that they were financially

capable of sponsoring her.  She told Plaintiff "our company earned around one million last year.

And we have been earning more than a million for several years now.  Of course, Best Care has

the financial capability to sponsor your green card application."  (Pl. 56.1 ¶ 21.)  Plaintiff claims

that De Castro told her:

> There is no reason for you to worry.  We have sponsored you for
> your [H-1B] status, and we will extend your status again next year.
> You will eventually be paid the offered wage when you get your
> green card approved.  And that will definitely happen because we
> have the financial capability to pay your wages.  We just want you
> to assure us that you would continue working for us for two more
> years after you get your green card approved.  Otherwise, if you
> cannot assure us, we will just withdraw your green card
> application.  And perhaps even your [H-1B] status.

(Pl. 56.1 ¶ 22.)  Plaintiff asserts that as a result of these representations, among others, she "was

forced by the circumstances to assure De Castro and Jordan that she would work for them until

two years after she receives her green card approval."  (Pl. 56.1 ¶ 23.)  De Castro then notified

the Labor Department that Best Care was interested in continuing the alien certification

application on Plaintiff's behalf.  (Pl. 56.1 ¶ 24.)

     According to Defendants, neither De Castro nor Jordan ever threatened to withdraw

Plaintiff's application unless she promised to remain working at Best Care for two years after

receiving her green card.  (Defs. 56.1 ¶ 19.)  Nor did they ever tell Plaintiff she would be paid the

wage represented in the immigration documents upon receipt of her green card.  (Defs. 56.1

¶ 23.)  De Castro and Jordan believed Best Care had the financial capacity to sponsor Plaintiff

and did notify the Labor Department that they would continue to sponsor Plaintiff.  (Defs. 56.1

¶¶ 23–24; Pl. Ex. 24.)

On July 19, 2007, the Labor Department approved Best Care's alien employment certification on behalf of Plaintiff for the position of accounting consultant at $29.26 per hour. (Pl. 56.1 ¶ 27; Defs. 56.1 ¶ 27; Pl. Ex. 23.)  In August 2007, De Castro advised Plaintiff that her alien employment certification was approved and that the next step in the green card process was to file an immigrant work petition with USCIS.  (Pl. 56.1 ¶ 28; Defs. 56.1 ¶ 28.)  Plaintiff claims that at this meeting, she complained about her salary and told Defendants that she needed to be paid at least the prevailing wage rate in accordance with the information in her immigration documents.  (Pl. 56.1 ¶ 29; Pl. Dep. 90:14–16; Aguirre Decl. ¶ 31.)  Plaintiff suggested to De Castro and Jordan that she was contemplating seeking other employers who would be willing to sponsor her for further extensions of her H-1B visa, and who would likely pay her the prevailing wage.  (Pl. 56.1 ¶ 30; Pl. Decl. ¶ 32.)  According to Plaintiff, De Castro told her that even if she could find another employer to sponsor her to further extend her H-1B visa, any application would be denied, as Plaintiff had already been on H-1B status for more than six years.  (Pl. 56.1 ¶ 30; Aguirre Decl. ¶ 33.)  Plaintiff asserts that De Castro and Jordan knew that if she was to leave their employment, she would lose her H-1B visa and have to leave the United States or risk staying illegally.  (Pl. 56.1 ¶ 32; Aguirre Decl. ¶ 34.)  De Castro and Jordan told her she would be paid the wage offered in her immigration documents once she received her green card, and that she would certainly get her green card application approved as Best Care had the financial capacity to pay the wage set forth in her immigration documents.  (Pl. 56.1 ¶ 33; Aguirre Decl. ¶ 35.)  Plaintiff claims that, relying on these representations and fearing deportation, she notified Weinrib to proceed in preparing the immigrant work petition and "acquiesced begrudgingly to receive actual wages that were far below the prevailing wage rates for her offered position."  (Pl. 56.1 ¶¶ 34–35; *see also* Pl. Decl. ¶ 36–37.)

According to De Castro and Jordan, they never threatened to stop processing Plaintiff's green card petition.  (Defs. 56.1 ¶ 19.)  Best Care, "[b]eing somewhat ignorant to the process, . . . believed that it had the financial capability to sponsor Plaintiff after she requested that they do so."  (De Castro Decl. ¶¶ 19, 21; Jordan Decl. ¶¶ 21, 23.)  "Best Care agreed to assist Plaintiff in her visa process to the best of their ability" and assisted her "out of kindness and sincerity in an effort for Plaintiff to obtain permanent lawful status in the United States."  (De Castro Decl. ¶ 20; Jordan Decl. ¶ 22.)  Defendants insist that Plaintiff accepted the secretarial position at Best Care for the purposes of gaining immigration benefits and that Plaintiff was the one to suggest that Defendants submit immigration documents that stated she was earning a different wage than she was.  (Defs. 56.1 ¶ 35.)

On August 15, 2007, Defendants submitted the immigrant work petition on Plaintiff's behalf to USCIS.  (Pl. 56.1 ¶ 36; Defs. 56.1 ¶ 36.)  Plaintiff then filed her application for adjustment of status to permanent residence with USCIS.  (Pl. 56.1 ¶ 37; Defs. 56.1 ¶ 37.)  On or about February 25, 2009, USCIS requested additional information from Best Care regarding its ability to pay Plaintiff the wage represented in the immigration documents.  (Pl. 56.1 ¶ 38; Defs. 56.1 ¶ 38.)  Defendants submitted several financial documents to USCIS, including Defendant Best Care's federal tax returns and corporate bank statements.  (Pl. 56.1 ¶ 39; Defs. 56.1 ¶ 39.)

On April 14, 2009, USCIS denied Plaintiff's immigrant work petition.  (Pl. 56.1 ¶ 40; Defs. 56.1 ¶ 40.)  USCIS determined that Best Care did not have the financial capacity to pay the wage represented in the immigration and labor documents.  (Pl. 56.1 ¶ 40; Defs. 56.1 ¶ 40; *see also* Pl. Ex. 27.)  USCIS noted that Best Care incurred net losses of $155,306 in 2006 and $527 in 2007.  (Pl. 56.1 ¶ 41; *see also* Pl. Ex. 27.)

After USCIS denied Plaintiff's immigrant work petition, De Castro and Jordan notified

Weinrib that they were not appealing the decision.  (Pl. 56.1 ¶ 42; Defs. 56.1 ¶ 42.)  Weinrib sent

a draft letter to be signed by Best Care's accountant about the financial ability of Best Care.

(Defs. 56.1 ¶ 42; Defs. Ex. 9.)  Best Care and its accountant determined that the draft letter

contained misinformation regarding Best Care's finances, and Best Care's accountant declined to

sign the draft letter.[5]  (Defs. 56.1 ¶ 42.)  Best Care decided it could no longer assist Plaintiff in

pursuing her green card.  (*Id.*)  Weinrib asked Defendants to reconsider, but Defendants chose

not to appeal the USCIS decision.  (Pl. 56.1 ¶ 43.)  Defendants claim "they did not want to

submit factual misstatements about Best Care's financial ability to the U.S. government."  (Defs.

56.1 ¶ 43.)

### d.  The Denial of Plaintiff's Adjustment of Status Application and DHS's Actions

As a result of the denial of her immigrant work petition, Plaintiff's adjustment of status

application was denied.  (Pl. 56.1 ¶ 44; Defs. 56.1 ¶ 44; Pl. Ex. 29.)  On or about July 6, 2009,

following the denial of her adjustment of status application, Plaintiff left her employment at Best

Care.  (Pl. 56.1 ¶ 45; Defs. 56.1 ¶ 45.)  DHS thereafter served Plaintiff with a Notice to Appear

in Immigration Court, effectively commencing removal proceedings against Plaintiff.  (Pl. 56.1

¶ 46; Defs. 56.1 ¶ 46.)

According to Plaintiff, during the entire time that she worked for Defendants, she was

forced to work for them and to receive compensation that was significantly less than the

prevailing wage rates.  (Pl. 56.1 ¶ 47.)  Plaintiff claims that, to her detriment, De Castro and

Jordan concealed material facts regarding the true financial health of Best Care.  (Pl. 56.1 ¶ 48.)

---

[5]  Plaintiff argues that Defendants misrepresent this letter.  (*See* Pl. Reply 17–19.)
According to Plaintiff, the letter and related email were dated March 24, 2009, before Plaintiff's
immigrant work petition was denied on April 14, 2009, and the letter was a draft prepared by
Weinrib to be submitted in response to USCIS's request for additional evidence, not a request for
Defendants to provide "false or misleading" information regarding any appeal.  (*Id.*)

Even though she was Defendants' accounting consultant, she never got to see Best Care's true financial heath, as she was not privy to Best Care's bank records and did not participate in the preparation of its budget, financial statements or income tax returns.  (*Id.*)  Plaintiff was tasked with preparing certain billing invoices and maintaining the employees' time sheets and schedules, but Defendants used an external accountant/auditor to take care of their financial statements and income tax documents.  (*Id.*)  Plaintiff argues that Defendants' concealment of Best Care's financial health prevented Plaintiff from discovering that Best Care had been operating at net losses for years 2003, 2006 and 2007, and did not have sufficient net income to cover Plaintiff's wage for years 2002, 2004 and 2005, as they promised to do in the immigration documents.[6]  (Pl. 56.1 ¶ 49.)  This misrepresentation caused Plaintiff to believe that Best Care had the financial capability to sponsor her as an immigrant worker through the immigration process, and in reliance on this misrepresentation, she continued to work for Best Care at less than the prevailing wage rate for her position.  (Pl. 56.1 ¶¶ 49–50.)  Had she known about the misrepresentations and omissions, she never would have allowed Best Care to sponsor her and would have ceased working for them.  (Pl. 56.1 ¶ 51.)

According to Defendants, Plaintiff was never forced to work for Best Care, but did so in order to further her own desire to become a legal resident.  (Defs. 56.1 ¶ 47.)  De Castro and Jordan never concealed material facts as to Best Care's financial ability to sponsor Plaintiff, but were simply unaware that their financials would pose a problem for Plaintiff's application.  (Defs. 56.1 ¶ 48.)  They did not know what income was required in order to sponsor Plaintiff to obtain her green card.  (Defs. 56.1 ¶¶ 52–57.)  Plaintiff was hired to perform secretarial work at

---

[6]  Plaintiff asserts that Defendants knew as of January or February in the years 2004 through 2009 that Best Care did not have the financial capability to pay Plaintiff the wage promised in the immigration documents for the prior years, and that they had net operating losses in 2003 ($62,244), 2006 ($155,306), 2007 ($528) and 2008 ($40,881).  (Pl. 56.1 ¶¶ 52–57.)

Best Care.  (*Id.*)  She was never hired to be an accounting consultant because Best Care

employed an accountant to handle its financial matters.  (*Id.*)  Plaintiff knew she would be

working as, and receiving the salary of, a secretary, while stating on her immigration documents

that she was working as, and receiving the salary of, an accounting consultant.  (Defs. 56.1

¶¶ 49–51.)  Plaintiff continued to work for Best Care because she wanted Best Care to sponsor

her to obtain her green card.  (Defs. 56.1 ¶¶ 49–50.)

### e.   Plaintiff's Interview by the Filipino Reporter

In September 2009, after Plaintiff left Best Care and received the Notice to Appear from

DHS, Plaintiff approached the Filipino Reporter, a newspaper in Manhattan, and informed them

of her immigration situation.  (Pl. 56.1 ¶ 59; Defs. 56.1 ¶ 59.)  After contacting De Castro for a

response, the Filipino Reporter published an article about Plaintiff's immigration situation

("September 2009 Filipino Reporter Article").  (Pl. 56.1 ¶ 60; Defs. 56.1 ¶ 60; Pl. Ex. 5.)  In the

article, Plaintiff blamed Best Care for her predicament, and stated that De Castro told her that

"they did not comply with the USCIS request for fear that the Internal Revenue Service would go

after them."  (Pl. Ex. 5.)  Plaintiff also alleged that, under a labor condition agreement signed by

De Castro, she was to be paid the prevailing wage but was not.  (*Id.*)

### f.   Subsequent Media Reports

In November 2009, the Filipino Reporter published a second article about Plaintiff's

upcoming December 2009 removal hearing before the Immigration Judge ("November 2009

Filipino Reporter Article").  (Pl. 56.1 ¶ 61; Defs. 56.1 ¶ 61.)  On December 20, 2010, Plaintiff

commenced this action against Defendants.  (Pl. 56.1 ¶ 62; Defs. 56.1 ¶ 62.)  On December 22,

2010, a news article about Plaintiff's Complaint against Defendants alleging human trafficking

was published in the Courthouse News Service.[7]   ("December 22, 2010 Courthouse News

Article").  (Pl. 56.1 ¶ 63; Defs. 56.1 ¶ 63; Pl. Ex. 6.)  The article contains many quotes from the

Complaint.[8]  (Pl. Ex. 6.)  According to Plaintiff, she did not give any interviews or statements to

either the Courthouse News Service or to the Filipino Reporter about the filing of the Complaint,

and she was never interviewed by the Filipino Reporter after the September 2009 interview.  (Pl.

56.1 ¶ 65.)  Defendants claim that the story Plaintiff told in her September 2009 interview was

re-published in these subsequent articles and Plaintiff is responsible for these republications.

(Def. Mem. 11–13; *see* Am. Answer with Am. Counterclaim ¶ 9–19.)

---

[7]  The Courthouse News Service "is a nationwide news service for lawyers and the news media" that publishes news reports and commentary about civil litigation. COURTHOUSE NEWS SERVICE (Nov. 14, 2008, 3:04 PM), http://www.courthousenews.com/aboutus.html.

[8]  For example, the article contains the following statements:  (1) "[A] Filipina accountant claims a nurses' staffing agency subjected her to human trafficking, promising but failing to sponsor her green card application, effectively enslaving her, paying her far less than promised and working her far more hours, and keeping her in 'silence, fear and obedience through the defendants' constant veiled threats and intimidated that she might be deported.'. . .  She claims that while the defendants mistreated her, they subjected her to 'constant veiled threats and intimidation that she might be deported if . . . she revealed to government authorities her mistreatment at the hands of her employers.'"  (Pl. Ex. 6 (quoting ¶ 69 of the Complaint).)  (2) "Aguirre says, 'Defendants knowingly presented immigration petitions containing false statements as to the true nature of employment of the plaintiff as well as the plaintiff's compensation rates to the Legacy INS (Immigration and Naturalization Service) and to its successor USCIS (US Citizenship and Immigration Services).'"  (*Id.* (quoting directly from ¶ 5 of the Complaint).)  (3) "After the INS approved the defendants' initial H-1B nonimmigrant petition, the defendants advanced their scheme by claiming that they would continue to sponsor her green card application if she agreed to work with them until 2 years after the application was approved, Aguirre says."  (*Id.* (paraphrasing information contained in ¶ 7 of the Complaint).)  (4) "Fearful of being found to be in the U.S. unlawfully, Aguirre said she reluctantly agreed to the defendants' demands.  But she says the scheme unraveled in April 2009 when immigration officials discovered Best Care did not have money to pay Aguirre her promised salary or to support the green card application.  As a consequence, Aguirre found herself not only out of work, but subject to deportation."  (*Id.* (summarizing allegations made in ¶¶ 35, 62–65 and 69 of the Complaint).)

### g.   Press Conference Attended by Plaintiff

In January 2011, Plaintiff appeared at a press conference held by a Filipino-American migrants' support group where she spoke about the allegations in her Complaint.  (Pl. 56.1 ¶ 66; Defs. 56.1 ¶ 66.)  According to Plaintiff, she spoke "fairly and truthfully" about the allegations in her Complaint and the only media person who covered the press conference and asked questions was Don Tagala of ABS-CBN, the Filipino Channel, and Balitang America.  (Pl. 56.1 ¶ 66; *see also* Pl. Dep. 133:17–134:7.)  Defendants claim that Plaintiff spoke "inaccurately and maliciously as against defendants and the allegations in her Complaint."  (Defs. 56.1 ¶ 66.)

### h.   Published Articles About the Lawsuit

In January 2011, several news sources published articles about Plaintiff's lawsuit.  On January 5, 2011, an article was published by Don Tagala in *Balitang America*, discussing two human trafficking lawsuits filed by Filipino women, one by Plaintiff and the other by Leticia Moratal ("January 5, 2011 Balitang America Article").  (Pl. Ex. 7.)  The article states that Plaintiff "filed a lawsuit . . . against Best Care Agency and its owners Dorothy de Castro and Perlita Jordan for subjecting her to human trafficking."  (*Id.*)  The article notes that Plaintiff "claims they made a false promise of sponsoring her [to obtain a] green card and making her work more hours with less pay," and that "they intimidated her with threats of deportation to keep her silent about the abuses."  (*Id.*)  On January 6, 2011, this article was republished in the Global Filipino News portion of the ABS-CBN News website under a different title ("January 6, 2011 Global Filipino Article").  (Pl. Ex. 8.)  It was also republished on January 7, 2011 on the "No to Trafficking" website under the same title as the January 6, 2011 Global Filipino Article ("January 7, 2011 No to Trafficking Article").  (Pl. Ex. 10.)

On January 7, 2011, Joseph Lariosa published an article on the Mabuhay Radio website

15

about the lawsuits filed by Plaintiff and Moratal ("January 7, 2011 Mabuhay Radio Article").

(Pl. Ex. 9.)  The article largely reproduces a news release posted on the National Alliance for

Filipino Concerns ("NAFCON") website on January 6, 2011, and included quotes from Lorena

Sanchez of the KABALIKAT Domestic Workers' Support Network, a member organization of

NAFCON based in New York and from Plaintiff's attorney ("January 6, 2011 NAFCON News

Release").  News Release, *Fil-Am Alliance Demands Justice for Moratal and Aguirre, Filipina*

*Victims of Labor Trafficking in New York*, NAFCON (Jan. 6, 2011),

http://nafconusa.org/2011/01/.  On January 11, 2011, the January 6, 2011 NAFCON News

Release was published on the Filipino Express website ("January 11, 2011 Filipino Express

Article").  (Pl. Ex. 11.)  The January 7, 2011 Mabuhay Radio article was republished on the

Philippines Today website on January 14, 2011 ("January 14 Philippines Today Article").[9]  (Pl.

Ex. 12.)

On January 15, 2011, a third article was published in the online edition of the Filipino

Reporter about Plaintiff's lawsuit ("January 15, 2011 Filipino Reporter Article").  (Pl. Ex. 13.)

The article clearly indicates that it is based on Plaintiff's lawsuit.  (*Id.* (stating "[i]n her lawsuit"

and "the suit says").)  The article directly quotes from the Complaint, stating that Plaintiff

claimed that Best Care "promised but failed to sponsor her green card application, effectively

enslaving her, paying her far less than promised for long hours of work, and keeping her in

'silence, fear and obedience through the defendants' constant veiled threats and intimidat[ion]

that she might be deported.'"[10] (*Id.*; *see also* Compl. ¶ 69.)  The article also states that the author

---

[9]  The last four paragraphs of the January 7, 2011 Mabuhay Radio article were not
included in the January 14 Philippines Today Article.  (*Compare* Pl. Ex. 9 *with* Pl. Ex. 12.)

[10]  The article also makes the following statements:  (1) "[Plaintiff] claims that Best
Care's De Castro and Jordan repeatedly told her that she would 'certainly receive the approval of

attempted to contact De Castro and Jordan, but that Jordan declined to comment and De Castro

was unavailable.  (Pl. Ex. 13.)  The article refers to a previous article about the Moratal lawsuit

and notes that Plaintiff is represented by the same lawyer as Moratal.  (*Id.*)

On January 21, 2011, Don Tagala published another article in Balitang America

("January 21 Balitang America Article").  (Pl. Ex. 14.)  The article states that the Filipino-

American Foundation for Immigration and Employment Advocacy is assisting Plaintiff with her

lawsuit and describes her allegations.  (*Id.*)  It quotes Plaintiff's counsel as stating that De Castro

and Jordan knew they did not have the financial capacity to sponsor Plaintiff but misrepresented

their financial capacity to Plaintiff, who became a "one woman office staffing agency for them."

(*Id.*)  It also states that Balitang America repeatedly called Best Care to obtain its response to

Plaintiff's allegations, but that De Castro and Jordan had not yet responded.  (*Id.*)  This article

was republished on Pinoy-OFW.com the next day ("January 22, 2011 Pinoy-OFW.com

Article").  (Pl. Ex. 15.)

---

her green card application' with their sponsorship and that Best Care had the financial means to
sponsor her through the immigration process."  (Pl. Ex. 13 (paraphrasing information found in
¶ 55 of the Complaint).)  (2) "At the same time, [Plaintiff] says, 'defendants knowingly presented
immigration petitions containing false statements as to the true nature of employment of the
plaintiff, as well as the plaintiff's compensation rates to the Legacy INS (Immigration and
Naturalization Service) and to its successor USCIS (U.S. Citizenship and Immigration
Services).'"  (*Id.* (quoting directly from ¶ 5 of the Complaint).)  (3) "Among other things, the
agency claimed it was paying her $19 an hour for a regular 40-hour work week though it paid her
only $8 an hour with no overtime pay, Aguirre says."  (*Id.* (paraphrasing information found in
¶¶ 29–33 of the Complaint).)  (3) "After the INS approved the defendants' initial H-1B
nonimmigrant petition, the defendants advanced their scheme by claiming they would continue
to sponsor her green card if she agreed to work with them for two years after the application was
approved, Aguirre says."  (*Id.* (paraphrasing information found in ¶ 7 of the Complaint).)
(4) "Fearful of losing her legal status in the U.S., Aguirre says she reluctantly agreed to the
defendants' demands.  However, in April 2009, the suit says immigration officials discovered
Best Care did not have financial capacity to pay Aguirre her promised salary and eventually
denied her application for adjustment of status for permanent residency.  As a result, Aguirre
found herself not only out of work, but subject to deportation."  (*Id.* (summarizing the allegations
made in ¶¶ 35, 62–65 and 69 of the Complaint).)

On January 22, 2011, Jerrie Abella published an article on the GMA News website about the Aguirre and Moratal lawsuits ("January 22, 2011 GMA News Article").  (Pl. Ex. 16.)  The article states that Plaintiff and Moratal sought the help of a Filipino migrants' organization in New York in order to sue their former employers, whom they accused of human trafficking.  (*Id.*)  It further states that Plaintiff and Moratal "recounted their ordeal" at a press conference in which NAFCON "vowed to assist [them] in their legal battle."  (*Id.*)  The article describes the allegations in the two lawsuits and NAFCON's anti-trafficking campaign.  (*Id.*)

Defendants claim that "the words so spoken by Plaintiff were and still are false and defamatory, were and still are known by Plaintiff to be false and defamatory, and were and still are spoken willfully and maliciously with the intent to damage the Defendants' good name, reputation, and credit as a health care staffing agency."  (Am. Answer with Am. Counterclaim ¶ 20.)  Defendants maintain that Plaintiff "knew and still knows that the statements she gave and continues to give, alleging that Defendants are engaged in the business of 'human trafficking' are false."  (Am. Answer with Am. Counterclaim ¶ 25.)

## II.  Discussion

### a.  Standard of Review

#### i.  Summary Judgment

Summary judgment is proper only when, construing the evidence in the light most favorable to the non-movant, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Kwong v. Bloomberg*, --- F.3d ---, ---, 2013 WL 3388446, at *4 (2d Cir. July 9, 2013); *Redd v. N.Y. Div. of Parole*, 678 F.3d 166, 174 (2d Cir. 2012).  The role of the court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Cioffi v.*

*Averill Park Cent. Sch. Dist. Bd. of Educ.*, 444 F.3d 158, 162 (2d Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).  A genuine issue of fact exists when there is sufficient "evidence on which the jury could reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 252.  The "mere existence of a scintilla of evidence" is not sufficient to defeat summary judgment; "there must be evidence on which the jury could reasonably find for the [non-moving party]." *Id.*  The court's function is to decide "whether, after resolving all ambiguities and drawing all inferences in favor of the non-moving party, a rational juror could find in favor of that party." *Pinto v. Allstate Ins. Co.*, 221 F.3d 394, 398 (2d Cir. 2000).

### ii.  Judgment on the Pleadings

Under Rule 12(c) of the Federal Rules of Civil Procedure, a party may move for judgment on the pleadings "[a]fter the pleadings are closed" but "early enough not to delay trial." Fed. R. Civ. P. 12(c); *Wright v. Monroe Cmty. Hosp.*, 493 F. App'x 233, 234 (2d Cir. 2012); *In re Bakery & Confectionery Union & Indus. Int'l Pension Fund Pension Plan*, 865 F. Supp. 2d 469, 471 (S.D.N.Y. 2012).  "The standard for addressing a Rule 12(c) motion for judgment on the pleadings is the same as that for a Rule 12(b)(6) motion to dismiss for failure to state a claim." *Cleveland v. Caplaw Enters.*, 448 F.3d 518, 520 (2d Cir. 2006); *see also Hayden v. Paterson*, 594 F.3d 150, 160 (2d Cir. 2010).  "In a challenge under Rule 12(c), the Court must accept as true the non-movant's allegations and draw all reasonable inferences in the non-movant's favor." *In re Bakery & Confectionery Union & Indus. Int'l Pension Fund Pension Plan*, 865 F. Supp. 2d at 471 (citing *Cleveland*, 448 F.3d at 521; *Sheppard v. Beerman*, 18 F.3d 147, 150 (2d Cir. 1994)).  However, the court need not accord "a legal conclusion couched as a factual allegation" the same presumption of truthfulness.  *N.J. Carpenters Health Fund v. Royal Bank of Scotland Grp., PLC*, 709 F.3d 109, 120 (2d Cir. 2013); *see also Goodman v. Merrill*

*Lynch & Co.*, 716 F. Supp. 2d 253, 258–59 (S.D.N.Y. 2010) (holding that, in assessing a motion for judgment on the pleadings, "a court need not accord '[l]egal conclusions, deductions or opinions couched as factual allegations . . . a presumption of truthfulness.'" (quoting *In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 95 (2d Cir. 2007))).

### b.  Plaintiff's Motion for Summary Judgment

#### i.  TVPRA Forced Labor

"The Trafficking Victims Protection Act was enacted in 2000, and the amendment creating its civil cause of action (part of the TVPRA), codified at 18 U.S.C. § 1595, was enacted only in December of 2003 and amended in December of 2008." *Velez v. Sanchez*, 693 F.3d 308, 324 (2d Cir. 2012) (citing Pub. L. No. 108–193, § 4(a)(4), 117 Stat. at 2877; Pub.L. No. 110–457, § 221, 122 Stat. 5044, 5067 (2008)).[11]  Civil liability for forced labor under 18 U.S.C.

---

[11]  Plaintiff argues that she can bring an action for conduct prior to the enactment of the civil cause of action provision of the TVPRA based on an implied cause of action.  The Second Circuit has held that "the civil cause of action [of the TVPRA] does not apply retroactively" to conduct occurring before December 19, 2003.  *Velez v. Sanchez*, 693 F.3d 308, 325 (2d Cir. 2012); *see also Ditullio v. Boehm*, 662 F.3d 1091, 1100 (9th Cir. 2011) ("[S]ection 1595 cannot apply retroactively to conduct that occurred before its effective date."); *Nattah v. Bush*, 770 F. Supp. 2d 193, 205 (D.D.C. 2011) (holding that the plaintiff could not maintain a claim under § 1595 because § 1595 was not enacted until after the alleged acts at issue).  Therefore, Plaintiff cannot recover on her TVPRA claims for any action that occurred prior to December 19, 2003.  *See Ditullio*, 662 F.3d at 1101–02 (holding that plaintiff could not recover for all of defendant's alleged conduct because § 1595 does not apply to pre-December 19, 2003 conduct, and remanding the case to the district court to determine whether defendant engaged in conduct that violated the TVPA after December 19, 2003); *Shukla v. Sharma*, No. 07-CV-2972, 2012 WL 481796, at *2 n.1 (E.D.N.Y. Feb. 14, 2012) ("Defendants could not be held liable for any conduct prior to the enactment of the Trafficking Victims Protection Reauthorization Act in late 2003, which added a civil cause of action.  The jury was instructed as such.  As the jury was also instructed, however, the evidence can be considered as background and context for the alleged post-amendment conduct."), *appeal dismissed* (2d Cir. June 1, 2012); *Doe v. Siddig*, 810 F. Supp. 2d 127, 136 (D.D.C. 2011) (denying defendants' motion to dismiss plaintiff's "claims for forced labor and trafficking for purposes of forced labor except insofar as those claims are predicated on acts predating December 19, 2003," and holding that plaintiff "may pursue such claims insofar as they relate to conduct occurring between December 19, 2003" and the date plaintiff left defendants' control).  Plaintiff relies on *Samirah v. Sabhnani*, 772 F. Supp. 2d 437,

§ 1589 requires a finding by a preponderance of the evidence that the defendant "knowingly

provide[d] or obtain[ed] the labor or service of a person" through one of the following prohibited

means:

> (1) by means of force, threats of force, physical restraint, or threats
> of physical restraint to that person or another person;
> (2) by means of serious harm or threats of serious harm to that
> person or another person;
> (3) by means of the abuse or threatened abuse of law or legal
> process; or
> (4) by means of any scheme, plan, or pattern intended to cause the
> person to believe that, if that person did not perform such labor
> or services, that person or another person would suffer serious
> harm or physical restraint.

18 U.S.C. § 1589(a); *see also United States v. Sabhnani*, 599 F.3d 215, 241–44 (2nd Cir. 2010);

*Shukla v. Sharma*, No. 07-CV-2972, 2012 WL 481796, at *2 (E.D.N.Y. Feb. 14, 2012), *appeal*

*dismissed* (2d Cir. June 1, 2012). "Serious harm" includes "threats of any consequences,

whether physical or non-physical, that are sufficient under all of the surrounding circumstances

to compel or coerce a reasonable person in the same situation to provide or to continue providing

labor or services." *Shukla*, 2012 WL 481796, at *2 (quoting *United States v. Bradley*, 390 F.3d

145, 151 (1st Cir. 2004), *vacated on sentencing grounds*, 545 U.S. 1101 (2005)); *see also* 18

U.S.C. § 1589, as amended by Pub. L. 110–457, Title II, § 222(b)(3), Dec. 23, 2008, 122 Stat.

5068 (codifying existing case law). "Abuse of the law or legal process" is the "use of threats of

legal action, whether administrative, civil, or criminal, in any manner or for any purpose for

which the law was not designed in order to coerce someone into working against that person's

will." *Shukla*, 2012 WL 481796, at *2 (citing *United States v. Garcia*, No. 02-CR-110S–01,

---

447 (E.D.N.Y. 2011), in support of her argument that an implied civil cause of action existed
under Sections 1589 and 1590 prior to December 19, 2003. (Docket Entry No. 44 ("Pl. Jan. 28,
2013 Letter").) However, based on the Second Circuit's decision in *Velez*, the Court finds that
the statutes do not apply to any acts complained of that occurred prior to December 19, 2003.

2003 WL 22956917, at *4–5 (W.D.N.Y. Dec. 2, 2003)); *see also* 18 U.S.C. § 1589, as amended by Pub. L. 110–457, Title II, § 222(b)(3), Dec. 23, 2008, 122 Stat. 5068 (codifying existing case law). A scheme, plan or pattern violates § 1589 where it is intended to cause a person to believe that, if she did not perform such labor or services, she or another individual would suffer serious harm. *See United States v. Calimlim*, 538 F.3d 706, 713 (7th Cir. 2008) ("The evidence showed that [the defendants] intentionally manipulated the situation so that [the individual] would feel compelled to remain. . . . Their vague warnings that someone might report [her] and their false statements that they were the only ones who lawfully could employ her could reasonably be viewed as a scheme to make her believe that she or her family would be harmed if she tried to leave."); *Nunag-Tanedo v. E. Baton Rouge Parish Sch. Bd.*, 790 F. Supp. 2d 1134, 1144–46 (C.D. Cal. 2011) (holding that the plaintiffs sufficiently alleged a § 1589 claim where plaintiffs alleged that defendants "intentionally manipulated the situation so that [p]laintiffs would feel compelled to remain and would obey all of [d]efendants' demands").

Plaintiff alleges that Defendants subjected her to forced labor in violation of § 1589 by "knowingly obtain[ing] her services by means of the abuse of immigration law or abuse of the immigration sponsorship process, or by means of a scheme intended to cause her to believe that, if she did not perform or continue to performing her services," she would lose their sponsorship and risk deportation. (Pl. Mem. 6.) Plaintiff claims that "Defendants utilized both the H-1B sponsorship process and the green card sponsorship process" to force her to remain working for them, for less than the prevailing wage rates, by threatening to discontinue their sponsorship, which would have subjected her to deportation. (*Id.*) Plaintiff also claims that Defendants misused the green card sponsorship process by misrepresenting Best Care's financial capacity to sponsor her. (*Id.* at 7–8.)

The threat of deportation alone may support a claim for forced labor. *Calimlim*, 538 F.3d at 713; *see also United States v. Kozminski*, 487 U.S. 931, 948 (1988) ("[T]hreatening . . . an immigrant with deportation could constitute the threat of legal coercion that induces involuntary servitude, even though such threat made to an adult citizen of normal intelligence would be too implausible to produce involuntary servitude."); *Nunag-Tanedo*, 790 F. Supp. 2d at 1146 (finding that threats to, among other things, fire plaintiffs, sue them, allow their visas to expire, or deport them sufficiently stated a claim for forced labor); *Garcia*, 2003 WL 22956917, at *4 (holding that threatening deportation "clearly fall[s] within the concept and definition of 'abuse of legal process' since the alleged objective for [such conduct] was to intimidate and coerce [the plaintiffs] into 'forced labor'" (citations omitted)).

Drawing all inferences in favor of Defendants, the Court finds that there are disputed material issues of fact as to whether Defendants abused the law or legal process or engaged in a scheme to mislead Plaintiff. Plaintiff argues that Defendants' actions evidence a violation of the law, however, a jury could reasonably conclude, based on the evidence, that Defendants did not abuse the immigration laws or the green card process, but rather, that Defendants attempted to assist Plaintiff in obtaining a green card by falsely claiming that she was employed as their accounting consultant when in fact she was employed as a secretary.

Best Care has presented the sworn declarations of both DeCastro and Jordon that Best Care hired Plaintiff for a position "mainly secretarial in nature," and never agreed to hire Plaintiff to perform any accounting duties, as Best Care already employed a certified accountant.[12] (De Castro Decl. ¶¶ 6, 9; Jordan Decl. ¶¶ 5, 7, 8.) Plaintiff admitted that De

---

[12]  Plaintiff argues that Defendants' affidavits are a "sham" and that Defendants "cannot deny that they offered Plaintiff the position of '[a]ccounting [c]onsultant,'" as the "record . . . is replete with evidence that Defendants offered Plaintiff the position of '[a]ccounting

Castro told her in their initial meeting that she needed a secretary, (Pl. Dep. 31:8–15), and

Plaintiff admitted that she was not familiar with the financials of Best Care because she did not

have access to Best Care's bank records, did not participate in the preparation of its budgets,

financial statements or income tax returns, all evidence from which a jury could reasonably

conclude that Plaintiff was never hired to work as an accountant consultant and never worked as

such, but instead was hired to work as a secretary, (Pl. 56.1 ¶ 48).

     In addition, Plaintiff admits that no one forced her to accept a position with Best Care and

that she did so because they offered to sponsor her to obtain an H-1B visa.  (Pl. Dep. 41:24–42:7,

45:5–18.)   There is evidence from which a jury could find, as Defendants argue, that it was

Plaintiff and her attorney who drafted and filed the immigration documents claiming Plaintiff

was an "[a]ccountant [c]onsultant" and that Plaintiff's immigration documents did not reflect the

actual wage she was paid or expected to be paid, but merely reflected an amount necessary for

Plaintiff to obtain immigration approval, and Defendants signed the documents only because

---

[c]onsultant,' and not of 'secretary.'"  (Pl. Reply 5.)  Plaintiff relies on the immigration
documents that Defendants signed on her behalf as well as the deposition testimony of De Castro
and Jordan acknowledging that Plaintiff's immigration documents stated that Plaintiff was being
offered the position and salary of an "[a]ccounting [c]onsultant."  (Pl. Reply 6–7 (quoting De
Castro Dep. 141–142; Jordan Dep. 84–85).)  Defendants have offered evidence that these
documents intentionally misrepresented Plaintiff's position and salary and that Defendants
signed these documents in order to assist Plaintiff.  The Court's role is not to resolve factual
disputes.  Drawing all inferences in favor of Defendants, the non-moving party, there is evidence
from which a jury could conclude that Defendants never agreed to pay Plaintiff the salary that
was stated in the immigration documents, but submitted those figures to various government
agencies to assist Plaintiff obtain immigration approval.  Despite Plaintiff's arguments to the
contrary, the declarations of De Castro and Jordan do not contradict their deposition testimonies.
(Pl. Reply 8.)  During their depositions, Plaintiff asked De Castro and Jordan about the
statements made in her immigration documents but did not ask them whether those statements
accurately reflected her employment with Best Care.  (*See e.g.*, De Castro Dep. 130:6–204:20;
Jordan Dep. 81:8–83:2.)  It is for the trier of fact, not the Court on a summary judgment motion,
to determine the credibility of De Castro and Jordan and to determine whether to accept their
explanation about the disparity between Plaintiff's position and salary as listed in her
immigration documents or to accept Plaintiff's argument.

they wanted to help Plaintiff, even though they contained false information.  (De Castro Decl. ¶¶ 11–14.)  A jury could accept the assertions of De Castro and Jordan that they agreed to help Plaintiff "out of kindness," in an effort to assist Plaintiff to obtain permanent lawful status in the United States.  (De Castro Decl. ¶¶ 20–21; Jordan Decl. ¶¶ 22–23.)  Plaintiff's email to Defendants, following the denial of her immigrant work petition, in which Plaintiff stated that she did not intend to actually accept the wage proposed in her immigration documents but needed that wage to be reflected in her papers, supports Defendants' argument.[13]  (Defs. Ex. 1.) Plaintiff's disagreement over the meaning of this email is only an additional unresolved factual issue that must be decided by a jury.  (Pl. Reply 17–18)  A jury could reasonably conclude that rather than support Plaintiff's claim that she was forced to work for Defendants and paid a wage below what they agreed to pay her, the email supports Defendants' argument that Plaintiff agreed to work as a secretary for the wage she was paid, and Defendants agreed to sign her immigration documents falsely representing that she was employed as an accounting consultant at a different wage simply to assist Plaintiff obtain an H-1B visa, extensions of that visa and a green card.

A jury could also find based on the testimony of DeCastro and Jordan that De Castro and Jordan never threatened to withdraw their sponsorship of Plaintiff and DeCastro and Jordan

---

[13]  Plaintiff disputes Defendants' interpretation of the email.  (Pl. Reply 14–17.)  Plaintiff points out that the email was dated April 20, 2009, after her immigrant work petition was denied. (Pl. Reply Aff. ¶ 15.)  She explains that, after her immigrant work petition was denied on account of Defendants' financial inability to pay the proffered wage, her lawyer informed her that, in the appeal, Best Care would have to provide additional financial documents and some wage adjustments had to be made by her employers.  (Pl. Reply 16; Pl. Reply Aff. ¶ 15.) Plaintiff emailed De Castro and Jordan, and advised them that the immigration lawyer stated she needed to be paid the proffered wage, and that since they did not pay her the proffered wage, some wage adjustments were necessary.  (Pl. Reply 16; Pl. Reply Aff. ¶ 16.)  She claims she was so desperate to salvage her green card, she offered to refund any wage adjustments from her personal checking account.  (Pl. Reply 16; Pl. Reply Aff. ¶ 16.)  Plaintiff argues that her desperate offer in 2009 does not reflect whether or not she had complained about her low wages for the eight years prior.  (Pl. Reply 17.)

25

believed Best Care had the financial ability to sponsor Plaintiff for an H-1B visa and a green card because they were unaware of USCIS's financial requirements necessary to sponsor Plaintiff and believed that having earned $1 million each year, they were financially capable of sponsoring Plaintiff.

Defendants have presented sufficient evidence to raise a genuine issue of material fact as to whether Defendants knowingly obtained Plaintiff's services through the abuse of immigration laws, abuse of process or by means of a scheme.  Plaintiff's motion for summary judgment as to this claim is denied.

### ii.  TVRPA Trafficking with Respect to Involuntary Servitude and Forced Labor

In her second cause of action, Plaintiff seeks damages pursuant to 18 U.S.C. § 1595 for Defendants' alleged violation of 18 U.S.C. § 1590, trafficking with respect to peonage, slavery, involuntary servitude or forced labor.  Section 1590 provides that anyone who "knowingly recruits, harbors, transports, provides, or obtains by any means, any person for labor or services in violation of" the statutes prohibiting slavery, forced labor or involuntary servitude, is guilty of trafficking.  18 U.S.C. § 1590(a); *see also Shukla*, 2012 WL 481796, at *5.

Plaintiff claims that "Defendants knowingly obtained Plaintiff's services as an Accounting Consultant for almost nine years under circumstances that clearly fall under involuntary servitude or forced labor," because Plaintiff "felt compelled and had to work for Defendants so that she would not become unlawfully present and be subjected to deportation proceedings." (Pl. Mem. at 11.)

26

As an initial matter, Plaintiff cannot maintain a § 1590 claim based on her initial recruitment, as she was hired prior to December 19, 2003.[14]  In addition, as discussed above, Defendants have presented sufficient evidence to raise a genuine issue of material fact as to whether or not Defendants knowingly subjected Plaintiff to forced labor.  *See supra* Part II.b.1. Moreover, Plaintiff has not articulated how or why her circumstances satisfy the definition of involuntary servitude.  *See Kozminski*, 487 U.S. at 952 (narrowly interpreting "involuntary servitude" under 18 U.S.C. § 1584 as "a condition of servitude in which the victim is forced to work for the defendant by the use or threat of physical restraint or physical injury, or by the use or threat of coercion through law or the legal process"); *McGarry v. Pallito*, 687 F.3d 505, 511 (2d Cir. 2012) (discussing *Kozminski*).  More importantly, however, Plaintiff has failed to demonstrate or explain how Defendants recruited, harbored, provided or obtained her services, a necessary element to prove trafficking under this statute.  *See Samirah v. Sabhnani*, 772 F. Supp. 2d 437, 447 (E.D.N.Y. 2011).  Without this element, Plaintiff's trafficking claim under this statute is nothing more than her forced labor claim restated.  *See Shuvalova v. Cunningham*, No. 10-CV-02159, 2010 WL 5387770, at *4 (N.D. Cal. Dec. 22, 2010) (holding that plaintiffs failed to state a distinct claim for trafficking, as opposed to forced labor, where the only allegations regarding defendants' conduct prior to plaintiffs' arrival at the property were that one defendant

---

[14]  As discussed above, Plaintiff cannot recover for Defendants' actions relating to her initial recruitment and H-1B immigration sponsorship since those actions took place prior to December 2003.  *See supra* note 11.  However, Plaintiff is not barred from recovering for any unlawful conduct engaged in by Defendants as of December 19, 2003, which alleged conduct could include Defendants' actions relating to the filing of the two H-1B visa extensions in March 2004 and April 2007 and the immigrant work petition in August 2007.  *Id.*  In order for Plaintiff to prevail on her trafficking claim, the jury will have to find that Defendants committed acts beginning on December 19, 2003 that violated § 1590.  *See, e.g.*, *Ditullio v. Boehm*, No. 09-CV-00113, 2012 WL 3018032, at *3 (D. Alaska July 24, 2012) (stating that the jury would have to determine whether plaintiff was exploited by defendant in violation of TVPRA § 1591 on or after December 19, 2003).

27

"promised to take care of [plaintiffs] in a loving home" (internal quotation marks omitted)).

Plaintiff's motion for summary judgment as to this claim is denied.

### iii.  Fraudulent Inducement

"Under New York law, for a plaintiff to prevail on a claim of fraud, [a plaintiff] must

prove five elements by clear and convincing evidence: (1) a material misrepresentation or

omission of fact, (2) made with knowledge of its falsity, (3) with an intent to defraud, and

(4) reasonable reliance on the part of the plaintiff, (5) that causes damage to the plaintiff."

*Gladstone Bus. Loan, LLC v. Randa Corp.*, No. 09-CV-4225, 2009 WL 2524608, at *3

(S.D.N.Y. Aug. 17, 2009) (quoting *Schlaifer Nance & Co. v. Estate of Andy Warhol*, 119 F.3d

91, 98 (2d Cir. 1997)); *see also Merrill Lynch & Co. v. Allegheny Energy, Inc.*, 500 F.3d 171,

181 (2d Cir. 2007) (stating that under New York law, a plaintiff making a fraudulent inducement

claim "must show by clear and convincing evidence that the defendant knowingly or recklessly

misrepresented a material fact, intending to induce the plaintiff's reliance, and that the plaintiff

relied on the misrepresentation and suffered damages as a result"); *Wilson v. Thorn Energy, LLC*,

787 F. Supp. 2d 286, 294 (S.D.N.Y. 2011) (listing the elements for fraudulent inducement, which

"is a particular species of fraud"); *Eurycleia Partners, LP v. Seward & Kissel, LLP*, 12 N.Y.3d

553, 559 (2009) ("The elements of a cause of action for fraud require a material

misrepresentation of a fact, knowledge of its falsity, an intent to induce reliance, justifiable

reliance by the plaintiff and damages.").

Plaintiff claims that Defendants fraudulently induced her to continue working for them at

wages lower than the prevailing wage rates by misrepresenting that Best Care had the financial

ability to sponsor her to obtain a green card.  (Pl. Mem. 11.)  Plaintiff claims that Defendants

assured her Best Care was financially capable of sponsoring her, knew that Best Care could not

pay her the salary offered in her immigration documents, intended for her to continue working

for an inadequate salary, and she relied on these assurances to her detriment.  (Pl. Mem. 11–13.)

As discussed below, there are genuine issues of material fact which preclude a finding of

fraudulent misrepresentation.

### 1.  Material Misrepresentation

"As the New York Court of Appeals has cautioned, '[t]he elements of fraud are narrowly

defined,' and '[n]ot every misrepresentation or omission rises to the level of fraud.'"  *Herzfeld v.*

*JPMorgan Chase Bank, N.A.*, 354 F. App'x 488, 489 (2d Cir. 2009) (quoting *Gaidon v.*

*Guardian Life Ins. Co. of Am.*, 94 N.Y.2d 330, 349–50 (1999)); *see Gaidon*, 94 N.Y.2d at 348

("A practice may carry the capacity to mislead or deceive a reasonable person but not be

fraudulent."); *see also Waldman v. New Chapter, Inc.*, 714 F. Supp. 2d 398, 406 n.9 (E.D.N.Y.

2010) ("New York law recognizes that a statement can be materially misleading without being a

material misrepresentation." (citing *Gaidon*, 94 N.Y.2d at 344–350)).  "A fraud claim must be

based on the 'representation of a material existing fact.'"  *Herzfeld*, 354 F. App'x at 489 (quoting

*N.Y. Univ. v. Continental Ins. Co.*, 87 N.Y.2d 308, 318 (1995)).  Materiality refers to statements

that are sufficiently important or relevant to influence the plaintiff's decision.  *See Mar-Cone*

*Appliance Parts Co. v. Mangan*, 879 F. Supp. 2d 344, 382 (W.D.N.Y. 2012) ("A

misrepresentation of fact is material if, in the context of the information known to the recipient,

the correctness of the alleged fact would have made a difference to the recipient in deciding upon

future action."); *Syncora Guarantee Inc. v. Countrywide Home Loans, Inc.*, 935 N.Y.S.2d 858,

868 (Sup. Ct. 2012) (stating that a New York common law claim for fraud requires that a

misrepresentation that "induces a party to take action"); *see also DNJ Logistic Grp., Inc. v. DHL*

*Exp. (USA), Inc.*, 727 F. Supp. 2d 160, 169 (E.D.N.Y. 2010) (finding that a misrepresentation of

fact was adequately alleged in support of fraudulent inducement claim as it was a question of fact as to whether the alleged misrepresentations induced the plaintiff to enter the contract); *c.f. Litwin v. Blackstone Group, L.P.*, 634 F.3d 706, 716–17 (2d Cir. 2011) (holding, in securities context, that in order to establish a "material misrepresentation," a plaintiff must offer sufficient evidence of "a statement or omission that a reasonable investor would have considered significant in making investment decisions"); *Monter v. Gonzales*, 430 F.3d 546, 557 (2d Cir. 2005) (defining, in immigration context, a material misrepresentation as one that "was predictably capable of affecting, i.e., had a natural tendency to affect, the official decision" (quoting *Kungys v. United States*, 485 U.S. 759, 771 (1988))); *Gaidon*, 94 N.Y.2d at 348 ("To state a claim for fraudulent inducement in an insurance context, plaintiffs must allege a 'misrepresentation or material omission' by defendants that induced plaintiffs to purchase the policies, as well as scienter, reliance and injury.").  Misrepresentations that are "so trifling as to be legally inconsequential" are not actionable representations of fact that can support a fraud claim, *Gaidon*, 94 N.Y.2d at 349–50, nor are statements that are "mere 'puffery' or are opinions as to future events," *Fitzgerald v. Chase Home Fin., LLC*, No. 10-CV-4148, 2011 WL 9195046, at *5 (S.D.N.Y. Feb. 28, 2011) (quoting *Cohen v. Koenig*, 25 F.3d 1168, 1172 (2d Cir. 1994)).

According to Plaintiff, Defendants misrepresented their financial ability to sponsor her to obtain her green card.  "[E]very time [she] inquired if Best Care indeed had [the] financial capability to sponsor her, [Defendants] told her she did not have to worry" as Best Care had the financial capability to sponsor her.  (Pl. Mem. 12–13.)  In June 2006, she asked De Castro and Jordan whether Best Care "had the financial capability to pay her the offered wage until the approval of her green card application," and Jordan replied, "You know, our company earned around one million last year.  And we have been earning more than a million for several years

30

now.  Of course, Best Care has the financial capability to sponsor your green card application."

(Pl. 56.1 ¶¶ 20, 21.)  De Castro also assured Plaintiff that they could financially sponsor her

when De Castro stated:

> There is no reason for you to worry.  We have sponsored you for
> your [H-1B] status, and we will extend your status again next year.
> You will eventually be paid the offered wage when you get your
> green card approved.  And that will definitely happen because we
> have the financial capability to pay your wages.

(Pl. 56.1 ¶ 22.)  Plaintiff claims that these assurances and others by Defendants which continued

"until their immigration petition was denied by the USCIS in April 2009," (Pl. Mem. 12), were

material misrepresentations that she relied on and which caused her injuries.

If Plaintiff's allegations are true, then these statements constitute material

misrepresentations of fact.  False statements regarding Best Care's ability to sponsor Plaintiff for

her green card are material, as it is not disputed that Best Care's ability to sponsor Plaintiff was

central to her decision to begin working and to continue working for Defendants.  However,

Defendants dispute Plaintiff's allegation that they made affirmative representations regarding

their financial capacity to sponsor her green card application.  (Def. 56.1 ¶¶ 33–34.)  De Castro

testified during her deposition that Best Care's financial capability to sponsor an immigrant

worker was never discussed.  (De Castro Dep. 225:11–18.)  It is for the jury to decide whether

they believe Plaintiff's testimony regarding statements purportedly made by De Castro and

Jordan or the testimony of De Castro and Jordan.  *See Fincher v. Depository Trust & Clearing

Corp.*, 604 F.3d 712, 725 (2d Cir. 2010) ("[T]he assessment of a witness's credibility is a

function reserved for the jury.").  There is a genuine issue of material fact as to whether

Defendants made materially false representations to Plaintiff regarding their financial capacity to

sponsor her for her green card.

### 2.  Defendants' Knowledge

In order to prevail on a claim for fraudulent inducement, a plaintiff must show that the defendant had knowledge of the falsity of the representation at the time the representation was made. *See Petrello v. White*, 344 F. App'x 651, 652 (2d Cir. 2009) (stating that a fraud in the inducement claim requires that the material misrepresentations be false and known to be false by the defendant); *Wilson v. Thorn Energy, LLC*, 787 F. Supp. 2d 286, 294 (S.D.N.Y. 2011) (denying plaintiffs summary judgment on their fraudulent inducement claim where a trier of fact could reasonably conclude that defendants did not make the representations with "actual knowledge of their falsity or reckless indifference to the truth"); *Neri v. R.J. Reynolds Tobacco Co.*, No. 98-CV-371, 2000 WL 33911224, *9 (N.D.N.Y. Sept. 28, 2000) (explaining that in order to support a fraud claim, the plaintiffs must show that the defendants knew that the alleged misrepresentations "were false at the time they were made"); *Centro Empresarial Cempresa S.A. v. Am. Movil, S.A.B. de C.V.*, 17 N.Y.3d 269, 276 (2011) (stating that in order to show fraudulent inducement, the plaintiff must establish "knowledge by the party who made the representation that it was false when made").  "[E]rrors or simple oversight on defendant's part . . . do not give rise to an inference of fraudulent intent." *Platinum Partners Value Arbitrage Fund LP v. Kroll Assocs.*, 957 N.Y.S.2d 336, 337 (App. Div. 2013).

Plaintiff relies on Best Care's tax returns to argue that Defendants knew that they did not have the financial capability to sponsor Plaintiff, but "lied" to Plaintiff in order "to ensure that Plaintiff would agree to continue working for them" at wagers lower than the wages "required" by law.  (Pl. Mem. 13.)  According to the tax returns, Best Care generated approximately $1 million each year in gross receipts but operated at a net loss in 2003, 2006, 2007 and 2008, and

operated at a net gain of less than $51,000 in 2002, 2004 and 2005.  (Pl. Exs. 27–38; De Castro

Dep. 192:24–201:22.)

Based on the evidence, assuming that a jury were to find that Defendants made

statements to Plaintiff about their financial capacity to sponsor Plaintiff, a jury could find that

Defendants believed that Best Care had the financial capacity to sponsor Plaintiff and did not

know that they did not have the capacity to do so until they were notified by USCIS.  Both De

Castro and Jordan maintain that they believed that Best Care had the financial capacity to

sponsor Plaintiff for her green card.  (De Castro Decl. ¶ 21; Jordan Decl. ¶ 23.)  Best Care

obtained Plaintiff's H-1B visa and two extensions, and complied with the government's request

for more information.  (De Castro Decl. ¶ 22.)  There is also evidence that Best Care had

successfully sponsored others in obtaining their green card in the past.  (De Castro Dep. 159:12–

160:2.)  When DeCastro and Jordan allegedly told Plaintiff they were financially capable of

sponsoring her, they pointed to their gross yearly income of over $1 million.  (*See* Pl. Exs. 27–

38.)  A jury could reasonably find that because Best Care had successfully sponsored green card

holders in the past, successfully obtained an H-1B visa for Plaintiff and two extensions during

the course of her employment, and earned a gross yearly income of over $1 million, DeCastro

and Jordan believed they could financially sponsor Plaintiff and did not know they needed to

have a net gain in their yearly income in order to be able to sponsor Plaintiff until they received

the denial letter from USCIS and, therefore, Defendants did not know that they were not

financially capable as required by USCIS to sponsor Plaintiff for her green card when they told

Plaintiff otherwise.[15]

---

[15]  Plaintiff argues that since Defendant Best Care had previously sponsored green card
applications successfully, Defendants knew what immigration services would require of a
sponsor in order to approve a green card application.  (Oral Arg. Tr. 24:21–25:6.)  However, a

### 3.  Defendants' Intent

A plaintiff must also establish that defendant made the false material misrepresentation with the intent to deceive.  *See, e.g.*, *Johnson v. Nextel Commc'ns, Inc.*, 660 F.3d 131, 143 (2d Cir. 2011) (listing "an intent to deceive" as an element of a fraudulent inducement claim); *Allianz Risk Transfer v. Paramount Pictures Corp.*, No. 08-CV-10420, 2010 WL 1253957, at *9 (S.D.N.Y. Mar. 31, 2010) ("To state a claim for common law fraud in New York, a plaintiff must show a material representation or omission of fact, made with[, among other things,] scienter or an intent to defraud . . . ."); *Friedman v. Anderson*, 803 N.Y.S.2d 514, 517 (App. Div. 2005) ("A fraud claim is not actionable without evidence that the misrepresentations were made with the intent to deceive." (citing *Handel v. Bruder*, 618 N.Y.S.2d 356 (App. Div. 1994))).  A plaintiff may establish scienter by either showing that "defendants had both motive and opportunity to commit fraud" or by showing "evidence of conscious misbehavior or recklessness."  *Inter-Local Pension Fund GCC/IBT v. Gen. Elec. Co.*, 445 F. App'x 368, 369 (2d Cir. 2011) (discussing scienter in the context of Section 10(b) of the Securities Exchange Act of 1934; *King Cnty., Wash. v. IKB Deutsche Industriebank AG*, No. 09-CV-8387, 2013 WL 45878, at *2 (S.D.N.Y. Jan. 3, 2013) ("The standard for evaluating whether plaintiffs have presented sufficient evidence of scienter is the same under New York common law as it is under Section 10(b) of the Securities Exchange Act of 1934."); *see Powers v. British Vita, P.L.C.*, 57 F.3d 176, 185–86 (2d Cir. 1995) ("Fraudulent intent may be inferred either through proof of a motive and clear opportunity to commit fraud or through facts indicating 'conscious behavior' that evinces fraudulent intent."); *Alnwick v. European Micro Holdings, Inc.*, 281 F. Supp. 2d 629, 641 (E.D.N.Y. 2003) ("In order to satisfy the scienter requirement [for common law fraud], the

---

jury could reasonably conclude that Defendants' prior successful sponsorships supports Defendants' argument that they thought they had the financial capability to sponsor Plaintiff.

plaintiff must allege either: (1) facts which demonstrate that the defendant had both the motive

and a clear opportunity to commit the fraud, or (2) facts which show strong circumstantial

evidence of conscious behavior or recklessness by the defendants." (citing *Powers*, 57 F.3d at

184)).   Intent to defraud "is ordinarily a question of fact which cannot be resolved on a motion

for summary judgment."   *UBS Real Estate Sec., Inc. v. Fairmont Funding Ltd.*, 862 N.Y.S.2d

818 (Sup. Ct. 2008) (quoting *Shisgal v. Brown*, 801 N.Y.S.2d 581, 583 (App. Div. 2005)); *see*

*also Century Pac., Inc. v. Hilton Hotels Corp.*, 528 F. Supp. 2d 206, 219 (S.D.N.Y. 2007)

("[S]ummary judgment should be considered skeptically in cases alleging fraudulent

inducement, because the issues typically turn on the parties' credibility as to their state of

mind."), *aff'd*, 354 F. App'x 496 (2d Cir. 2009); *Insinga v. Cooperatieve Centrale Raiffeisen*

*Borenleenbank B.A*., No. 03-CV-7775, 2005 WL 2345293, at *8 (S.D.N.Y. Sept. 20, 2005) ("To

be sure, issues of fraudulent intent are generally left for resolution by the factfinder." (citing

*Nat'l Union Fire Ins. Co. of Pittsburgh v. Turtur*, 892 F.2d 199, 205 (2d Cir. 1989))).

   Plaintiff claims that De Castro and Jordan lied about Best Care's financial capacity to

sponsor her green card application so that Plaintiff would continue working for them for less

than the prevailing wage rate for an accountant consultant.   (Pl. Mem. 12–13.)   Plaintiff argues

that, had she known the truth, she never would have allowed herself to be sponsored by Best

Care through the immigration process and would have ceased working for Defendants.   (Pl. 56.1

¶ 51.)   De Castro and Jordan claim that Best Care "agreed to assist Plaintiff in her visa process to

the best of their ability" out of "kindness and sincerity in an effort for Plaintiff to obtain lawful

status in the United States."   (De Castro Decl. ¶ 20; Jordan Decl. ¶ 22.)   Similar to the Court's

inability to determine whether Defendants knew that they did not have the financial capacity to

sponsor Plaintiff, the Court cannot determine that Defendants intended to defraud Plaintiff

assuming they assured her that they were financially capable of sponsoring her.  There are genuine issues of facts from which a jury could determine that Defendants intended to assist Plaintiff in obtaining her green card and had no intent to make any material misrepresentations to her when they allegedly told her that they were financially capable of sponsoring her. Defendants provided all the financial documents that were requested by the immigration authorities; they had successfully gone through the process to obtain green cards for others; and they had successfully obtained an H-1B visa and extensions of that visa for Plaintiff.  This evidence can support an inference that Defendants had no intent to deceive Plaintiff.

Plaintiff's motion for summary judgment as to her fraudulent inducement claim is denied.

### iv.  Negligent Misrepresentation

Under New York law, in order to state a claim for negligent misrepresentation, "the plaintiff must allege that '(1) the defendant had a duty, as a result of a special relationship, to give correct information; (2) the defendant made a false representation that he or she should have known was incorrect; (3) the information supplied in the representation was known by the defendant to be desired by the plaintiff for a serious purpose; (4) the plaintiff intended to rely and act upon it; and (5) the plaintiff reasonably relied on it to his or her detriment.'" *Anschutz Corp. v. Merrill Lynch & Co., Inc.*, 690 F.3d 98, 114 (2d Cir. 2012) (quoting *Hydro Investors v. Trafalgar Power Inc.*, 227 F.3d 8, 20 (2d Cir. 2000)); *see also King County, Wash.*, 863 F. Supp. 2d at 299 (quoting *Hydro Investors*, 227 F.3d at 20), *reconsideration denied*, 863 F. Supp. 2d 317 (S.D.N.Y. 2012).  "[T]he alleged misrepresentation must be factual in nature and not promissory or relating to future events that might not ever come to fruition." *Hydro Investors*, 227 F.3d at 20–21.

36

Plaintiff claims that Defendants negligently misrepresented to Plaintiff that Best Care had the financial capacity to sponsor her to obtain a green card.  (Pl. Mem. at 13.)  Plaintiff claims that (1) Defendants owed her a duty of care because they "held a position of trust and confidence" as her immigration sponsor; (2) Defendants knew that their representations regarding Best Care's financial capacity were false because "they knew, as early as the first three months of each year, that Defendant Best Care did not have sufficient income to cover Plaintiff's offered wage for each of the previous fiscal year[s]"; (3) Defendants intended that Plaintiff would "rely on [those] misrepresentations and continue to work for [Best Care] at . . . low wages"; and (4) Plaintiff in fact relied on those misrepresentations "to her detriment."  (Pl. Mem. 13–14.)

As discussed above, there are disputed issues of material fact as to whether Defendants made any representations to Plaintiff about their financial ability to sponsor Plaintiff, and, even assuming that they did make representations to Plaintiff, that Defendants had any knowledge that these representations were false.  In order to support her negligent misrepresentation claim, a plaintiff must establish that "defendant made a false representation that he or she should have known was incorrect." *Anschutz Corp.*, 690 F.3d at 114 (quoting *Hydro Investors*, 227 F.3d at 20); *see Century Pac.*, 528 F. Supp. 2d at 232 (dismissing plaintiff's negligent misrepresentation because, among other things, plaintiff failed to raise a triable issue of fact as to a false representation having been made to it that the maker should have known was incorrect").  These disputed issues of fact preclude a finding that Defendants negligently misrepresented their financial ability to sponsor Plaintiff for a green card.  Plaintiff's motion for summary judgment as to her negligent misrepresentation claim is denied.

### v. Defendants' Defamation Counterclaim

In their Amended Answer, Defendants assert a counterclaim for defamation against Plaintiff, alleging that "[o]n or about September, 2009 and continuing to present day, Plaintiff . . . in the presence of several employees of various media outlets, maliciously spoke and continues to speak out of and concerning the Defendants . . . eliciting false and misleading statements to the general public and falsely accusing Defendants of 'human trafficking.'" (Am. Answer with Am. Counterclaim.)

"Under New York law, the elements of a defamation claim are 'a false statement, published without privilege or authorization to a third party, constituting fault . . . and it must either cause special harm or constitute a defamation per se.'" *Peters v. Baldwin Union Free Sch. Dist.*, 320 F.3d 164, 169 (2d Cir. 2003) (quoting *Dillon v. City of New York*, 704 N.Y.S.2d 1, 5 (App. Div. 1999)); *see also Egiazaryan v. Zalmayev*, No. 11-CV-2670, 2011 WL 6097136, at *3 (S.D.N.Y. Dec. 7, 2011) ("Under New York law, the elements of defamation are (1) a defamatory statement of fact, (2) regarding the plaintiff, (3) published to a third party, (4) that is false, (5) made with the applicable level of fault, (6) causing injury, and (7) not protected by privilege." (citing *Dillon*, 704 N.Y.S.2d at 5)). Defamation may take the "form of a published written expression (including pictures), *i.e.*, libel, or a published oral expression, *i.e.*, slander." *Croton Watch Co., Inc. v. Nat'l Jeweler Magazine, Inc.*, No. 06-CV-662, 2006 WL 2254818, at *3 (S.D.N.Y. Aug. 7, 2006) (citation omitted). A defamatory statement is one that exposes the plaintiff "to public hatred, shame, obloquy, contumely, odium, contempt, ridicule, aversion, ostracism, degradation, or disgrace, or . . . induces an evil opinion of one in the minds of right-thinking persons, and . . . deprives one of . . . confidence and friendly intercourse in society.'" *Biro v. Conde Nast*, No. 11-CV-4442, 2012 WL 3234106, at *8 (S.D.N.Y. Aug. 9, 2012)

(alterations in original) (quoting *Karedes v. Ackerley Group, Inc.*, 423 F.3d 107, 113 (2d Cir.

2005)).

According to Defendants, in September 2009, Plaintiff met with Filipino Reporter

publisher Bert Pelayo, after which her story was published in an article entitled "Facing

Deportation, Filipino Seeks Help."  (Defs. Ex. 2.)  The article stated, among other things, that

Plaintiff "claimed her petition was rejected after her employers declined to comply with a USCIS

request for evidence that she was being paid the proffered wage determined by the U.S.

Department of Labor," and identified her employer as Best Care, a company owned and operated

by De Castro and Jordan.  (*Id*.)  The article quoted Plaintiff as stating that "De Castro told [her]

that they did not comply with the USCIS request for fear the Internal Revenue Service would go

after them."  (*Id*.)  Defendants claim that these statements are false, since Defendants submitted

additional evidence at the request of USCIS "in an effort to continue helping Plaintiff obtain her

[g]reen [c]ard."  (Def. Mem. 10.)  Defendants maintain that Plaintiff's statements "that

Defendants refused to comply with [the request of] USCIS for their own personal reasons is

completely untrue and portrays Defendants in a false and negative light."  (Def. Mem. 11.)  In

November 2009, the *Filipino Reporter* published a second article about Plaintiff's December

2009 removal hearing before the Immigration Judge.  (Pl. 56.1 ¶ 61; Defs. 56.1 ¶ 61.)

Defendants assert that the story Plaintiff told in her September 2009 interview was re-published

in subsequent articles after Plaintiff filed the instant complaint against Defendants, alleging,

among other things, that they violated the TVPRA.  (Def. Mem. 11.)  Defendants' counterclaim

refers to eleven newspaper or internet articles published after the filing of the Complaint that

they allege are republications of Plaintiff's initial story, and Defendants allege that Plaintiff is

liable for each republication.  (Am. Answer with Am. Counterclaim, Counterclaim ¶¶ 9–19.)

Defendants maintain that each of these articles "portrays [D]efendants . . . as criminals, traffickers and abusers," and that "is simply untrue." (Def. Mem. 11.)

The Court categorizes these articles into two main categories: (1) articles published prior to the filing of the Complaint which include the September 2009 and November 2009 articles published in the Filipino Reporter; and (2) the other eleven articles published after the Complaint was filed on December 22, 2010.

### 1. Articles published before the filing of the Complaint

The Court dismisses the counterclaim as to the statements contained in the September 2009 and November 2009 Filipino Reporter Articles as being time-barred by the applicable statute of limitations. The statute of limitations for defamation in New York is one year. N.Y. C.P.L.R. § 215(3); *see also McKenzie v. Dow Jones & Co., Inc.*, 355 F. App'x 533, 535 (2d Cir. 2009); *Hernandez v. Bettino*, No. 11-CV-4235, 2013 WL 285585, at *1 (S.D.N.Y. Jan. 24, 2013). Defendants cannot maintain a cause of action based on Plaintiff's statements published in either the September 2009 or November 2009 Filipino Reporter Articles because those statements were made in September 2009 and republished in November 2009, and Defendants did not file their counterclaim until January 24, 2011. Defendants do not dispute that the one-year statute of limitations applies to their defamation claim. (Def. Mem. 11.) They argue, however, that each of the newspaper or internet articles which republished the same alleged defamatory statements constitutes a separate publication for which a separate cause of action arises. (Defs. Mem. 11.)

### 2. Articles published after the filing of the Complaint

Defendants' counterclaim refers to eleven newspaper or internet articles published after the filing of the Complaint that they allege are republications of Plaintiff's initial story. (Am.

Answer with Am. Counterclaim, Counterclaim ¶¶ 9–19.)  "[A]nyone giving a statement to a

representative of a newspaper authorizing or intending its publication is responsible for any

damage caused by the publication."  *D'Olimpio v. Crisafi*, 718 F. Supp. 2d 340, 356 n.8

(S.D.N.Y. 2010) (quoting *Camp v. Paar*, 239 N.Y.S.2d 494, 494 (App. Div. 1963)), *aff'd*, 462 F.

App'x 79 (2d Cir. 2012); *Pisani v. Staten Island Univ. Hosp.*, No. 06-CV-1016, 2008 WL

1771922, at *10 (E.D.N.Y. Apr. 15, 2008) (quoting *Croton Watch Co*, 2006 WL 2254818, at *6

n.6).  The Second Circuit has held, however, that "a plaintiff may not recover damages from the

original author for . . . slander arising from the republication of defamatory statements by a third

party absent a showing that the original author was responsible for or ratified the republication."

*Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*, 314 F.3d 48, 59 (2d Cir. 2002); *see*

*Pisani*, 2008 WL 1771922, at *10 (quoting *Fashion Boutique of Short Hills*, 314 F.3d at 59); *see*

*also Pasqualini v. MortgageIT, Inc.*, 498 F. Supp. 2d 659, 670–71 (S.D.N.Y. 2007) (noting that

"republication of the defamatory material by a third party cannot be attributed to the original

publisher . . . absent her personal involvement in or ratification of the republication").  Therefore,

in order to prevail on a defamation claim based on a republication, a party must establish that the

originator of the defamatory statement was responsible for or ratified the allegedly defamatory

statements.[16]

---

[16]   Some district courts have applied a foreseeability standard under which the originator
of the defamatory statement is liable for the foreseeable republication of the statement.  *See, e.g.*,
*D'Olimpio v. Crisafi*, 718 F. Supp. 2d 340, 356 n.8 (S.D.N.Y. 2010) ("The rationale for making
the originator of a defamatory statement liable for its foreseeable republication is the strong
causal link between the actions of the originator and the damage caused by the republication."
(quoting *Van-Go Transp. Co. v. N.Y.C. Bd. of Educ.*, 971 F.Supp. 90, 102 (E.D.N.Y. 1997))).
The New York Court of Appeals has not decided whether a defendant can be held liable for
restatements if he participated in the original publication with "knowledge or a reasonable
expectation that republication was likely."  *Karaduman v. Newsday, Inc.*, 51 N.Y.2d 531, 541 n.2
(1980) (leaving open the possibility that three reporters could have been held legally responsible
for the republication of their article in book form "had plaintiff been able to demonstrate that

Although Defendants characterize these eleven articles as republications of the September 2009 Filipino Reporter article, (Defs. 56.1 ¶¶ 67, 71–83), these articles do not repeat Plaintiff's statements made in the original article.  Instead, they quote or summarize the Complaint.  A few of the articles refer to out of court statements made by Plaintiff and Plaintiff's attorney about the lawsuit, at the January 2011 press conference.  For the reasons discussed below, these statements are privileged and cannot support Defendants' defamation claim.

## A.  Privileges Relating to Judicial Proceedings

"New York has traditionally accorded an absolute privilege to oral or written communications made in the course of judicial proceedings and which relate to the litigation." *D'Annunzio v. Ayken, Inc.*, 876 F. Supp. 2d 211, 216 (E.D.N.Y. 2012); *see also Conte v. Newsday, Inc.*, 703 F. Supp. 2d 126, 146 (E.D.N.Y. 2010).  A statement made in the course of a judicial proceeding "is absolutely privileged if, by any view or under any circumstances, it may be considered pertinent to the litigation."  *Sklover v. Sack*, 958 N.Y.S.2d 474, 476 (App. Div. 2013) (quoting *Martirano v. Frost,* 25 N.Y.2d 505, 507 (1969)); *see also Kelly v. Albarino*, 485 F.3d 664, 664 (2d Cir. 2007) (affirming district court's discussion of the absolute privilege that applies to statements made by participants in judicial proceedings).  The common law litigant's privilege "offers a shield to one who publishes libelous statements in a pleading or in open court for the purpose of protecting litigants' zeal in furthering their causes."  *D'Annunzio*, 876 F. Supp.

---

they participated in the original publication *with knowledge or a reasonable expectation* that republication was likely" (emphasis added)).  In its most recent defamation case to discuss republication, the Court of Appeals acknowledged that *Karaduman* left open the question of whether a claimant can proceed on a foreseeability of republication theory, and found that, even if the court were to adopt a foreseeability standard, the plaintiff could not meet it.  *Geraci v. Probst*, 15 N.Y.3d 336, 342–44 (2010).  The Court of Appeals rested its decision in *Geraci* on the fact that the defendants "had no knowledge of and played no role in the republication or its implementation."  *Id.* (internal quotation marks omitted).

2d at 217 (quoting *Bridge C.A.T. Scan Assocs. v. Ohio–Nuclear, Inc.*, 608 F.Supp. 1187, 1195 (S.D.N.Y. 1985)).

"The privilege for in-court statements is considerably broader in scope than that for out-of-court reports relating to the proceedings." *Long v. Marubeni Am. Corp.*, 406 F. Supp. 2d 285, 294 (S.D.N.Y. 2005). The common law litigants' privilege does not cover out of court statements, such as those made in a press release or press conference, because they are not made during the course of judicial proceedings. *Id*; *see also D'Annunzio*, 876 F. Supp. 2d at 217. Out of court statements are governed by Section 74 of the New York Civil Rights Law, which provides that "[a] civil action cannot be maintained against any person, firm or corporation, for the publication of a fair and true report of any judicial proceeding." N.Y. Civ. Rights Law § 74; *see also Geiger v. Town of Greece*, 311 F. App'x 413, 417 (2d Cir. 2009). "For a report to be characterized as 'fair and true' within the meaning of the statute, . . . it is enough that the substance of the article be substantially accurate. . . . '[A] fair and true report admits of some liberality; the exact words of every proceeding need not be given if the substance be substantially stated.'" *Geiger*, 311 F. App'x at 417 (quoting *Holy Spirit Ass'n for Unification of World Christianity v. N.Y. Times Co.*, 49 N.Y.2d 63, 67 (1979)); *see also D'Annunzio*, 876 F. Supp. 2d at 217 (stating that "[t]he challenged language . . . 'should not be dissected and analyzed with a lexicographer's precision'" (quoting *Idema v. Wager*, 120 F. Supp. 2d 361, 369 (S.D.N.Y. 2000))); *McRedmond v. Sutton Place Rest. & Bar, Inc.*, 851 N.Y.S.2d 478, 479 (App. Div. 2008) ("To be 'fair and true,' the account need only be 'substantially accurate.'" (citing *Holy Spirit Ass'n*, 49 N.Y.2d at 67)); *see also Silver v. Kuehbeck*, No. 05-CV-35, 2005 WL 2990642, at *16 (S.D.N.Y. Nov. 7, 2005) ("A statement is 'substantially accurate' 'if, despite minor inaccuracies, it does not produce a different effect on a reader than would a report containing the precise

truth.'" (quoting *Zerman v. Sullivan & Cromwell*, 677 F. Supp. 1316, 1322 (S.D.N.Y. 1988))),

*aff'd*, 217 F. App'x 18 (2d Cir. 2007).  "It is sufficient that the plaintiff's complaint or

documents referred to therein form the basis for each of the contested statements."  *D'Annunzio*,

876 F. Supp. 2d at 217–18 (citing *McRedmond*, 851 N.Y.S.2d at 478); *see also Lacher v. Engel*,

817 N.Y.S.2d 37, 43 (2006) ("The § 74 privilege, unlike the common-law privilege . . ., applies

to comments made about proceedings.  Comments that essentially summarize or restate the

allegations of a pleading filed in an action are the type of statements that fall within § 74's

privilege.").

However, statements that "suggest more serious conduct than that actually suggested in

the official proceeding" are not protected.  *Geiger*, 311 F. App'x at 417 (quoting *Karedes v.

Ackerley Group, Inc.*, 423 F.3d 107, 119 (2d Cir. 2005)).  "The protections of section 74 extend

to pleadings, transcripts, live proceedings and the release by the parties of background material

regarding their positions in the case."  *Riel v. Morgan Stanley*, No. 06-CV-524, 2007 WL

541955, at *10 (S.D.N.Y. Feb. 16, 2007), *aff'd*, 299 F. App'x 91 (2d Cir. 2008).  Where the

parties have submitted the allegedly defamatory passages to the court, the court "may determine

as a matter of law whether allegedly defamatory publications are 'fair and true' reports of official

proceedings."  *Fine v. ESPN, Inc.*, No. 12-CV-0836, 2013 WL 528468, at *3 (N.D.N.Y. Feb. 11,

2013) (citing *Test Masters Educ. Servs., Inc. v. NYP Holdings, Inc.*, 603 F. Supp. 2d 584, 589

(S.D.N.Y. 2009) and *Easton v. Pub. Citizens, Inc.*, No. 91-CV-1639, 1991 WL 280688, at *2

(S.D.N.Y. Dec. 26, 1991)).

## B.  Plaintiff's Alleged Defamatory Statements

### i.  Allegations Stated in the Complaint

Five of the articles submitted by Defendants in support of their counterclaim are based entirely on the Complaint.  The December 22, 2010 Courthouse News Article specifically references and summarizes the Complaint, and the quotations attributed to Plaintiff are taken from the Complaint.  (Pl. Ex. 6.)  The January 5, 2011 Balitang America Article summarizes the allegations made in the Complaint and in the Moratal lawsuit.  (Pl. Ex. 7.)  The January 6, 2011 Global Filipino Article and the January 7, 2011 No to Trafficking Article are identical to the January 5, 2011 Balitang America Article.  (Pl. Exs. 8, 10.)  The January 15, 2011 Filipino Reporter Article references, summarizes and quotes the Complaint.  (Pl. Ex. 13.)  Defendants cannot maintain a defamation claim based on these articles because the statements made in the Complaint are absolutely privileged.[17]  *See Cipolla v. County of Rensselaer*, 129 F. Supp. 2d

---

[17]  Although Defendants allege that Plaintiff gave statements to "each and every" media source (Am. Answer with Am. Counterclaim, Counterclaim ¶ 26), Defendants have not offered any evidence that Plaintiff gave statements to the authors or publishers of these five articles. Defendants have offered no evidence that Plaintiff contacted the media beyond her initial interview in September 2009 and the press conference in January 2011.  On their face, these articles appear to be based on the Complaint.  *Gristede's Foods, Inc. v. Poospatuck (Unkechauge) Nation*, No. 06-CV-1260, 2009 WL 4547792, at * 19 (dismissing a defamation counterclaim based on a segment of a *Newsday* article that was attributed to the complaint filed by plaintiff, because the counterclaim did not allege that the plaintiff sought out the author of *Newsday* "in order to publicize the allegations of their complaint or that the plaintiff republished the complaint to the author or to another third party outside the course of the judicial proceeding").  Even if these articles were based on, or instigated by, out of court statements made by Plaintiff or Plaintiff's attorney, such as those made at the press conference, the statements would be protected by Civil Rights Law § 74.  *See id*. (dismissing a separate defamation counterclaim based on a different segment of the *Newsday* article quoting an out of court statement made by plaintiff's attorney, because, among other things, the statement was privileged under Civil Rights Law § 74; the statement's suggestion of black market activity by defendants was "identical to the allegations in the underlying litigation" and did not imply that defendants "engaged in any misconduct other than that already alleged in the complaint"); *see also Riel v. Morgan Stanley*, No. 06-CV-524, 2007 WL 541955, at *10 (S.D.N.Y. Feb. 16, 2007) (dismissing plaintiff's defamation claim based on statements in a *Wall Street* journal article,

436, 458 (N.D.N.Y. 2001) (granting defendants' motion for summary judgment on plaintiffs'

defamation claims based on newspaper articles containing reports of a trial and defendants' trial

testimony; the articles did not attribute statements, other than testimony, to defendants, and

"[d]efendants' statements at trial, and the republication of those statements, are protected by the

absolute privilege New York grants pertinent statements made in the course of judicial

proceedings"), *aff'd*, 20 F. App'x 84 (2d Cir. 2001); *see also Capsolas v. Pasta Res., Inc.*, No.

12-CV-5533, 2013 WL 703670, at *2 (S.D.N.Y. Feb. 26, 2013) (dismissing defamation

countclaim based on the contents of the complaint because "[j]udicial proceedings are among the

settings in which an absolute privilege is recognized, and a statement made in the course of legal

proceedings is absolutely privileged if it is at all pertinent to the litigation" (internal quotation

marks omitted); *Gristede's Foods, Inc. v. Poospatuck (Unkechauge) Nation*, No. 06-CV-1260,

2009 WL 4547792, at *9–10 (E.D.N.Y. Dec. 1, 2009) (holding that defendants could not

maintain a defamation claim against plaintiff for statements made in the second amended

complaint because plaintiff's statements were absolutely privileged); *Kaye v. Trump*, 873

N.Y.S.2d 5, 6 (App. Div. 2009) (holding that plaintiff failed to state a cause of action for

defamation based on the actions instituted against her because "the statements made in the

complaints . . . are absolutely privileged").

### ii.  Out of Court Statements

In addition to summarizing the allegations made in the Complaint, the remaining six

articles about the instant lawsuit appear to obtain information from out of court statements made

---

because "it . . . appears from the face of the article that the reporting was based on court
records," but even "if [defendant] reported to the *Journal* what is contained in court records,
such reporting is within the express terms of section 74" (citing *El Greco Leather Prods. Co.,
Inc. v. Shoe World, Inc.*, 623 F. Supp. 1038 (E.D.N.Y. 1985))), *aff'd*, 299 F. App'x 91 (2d Cir.
2008).

about the lawsuit by Plaintiff and Plaintiff's attorney.[18]  The January 7, 2011 Mabuhay Radio

Article largely reproduces the January 6, 2011 NAFCON News Release, which summarizes the

allegations made in the lawsuits filed by Plaintiff and Moratal and describes the NAFCON anti-

trafficking campaign.  (*Compare* Pl. Ex. 9; *with* News Release, *Fil-Am Alliance Demands Justice*

*for Moratal and Aguirre, Filipina Victims of Labor Trafficking in New York*, NAFCON (Jan. 6,

2011), http://nafconusa.org/2011/01/.)  Plaintiff's attorney is quoted as stating that Moratal and

Plaintiff "are heroes for stepping forward courageously to fight common injustices inflicted upon

foreign workers in this country — labor trafficking and modern-day slavery," and that "[i]t is

NAFCON's hope that their example helps other trafficking victims living in fear to come

forward and, with community support, fight for justice."  (Pl. Ex. 9.)  The January 11, 2011

Filipino Express Article is identical to the January 6, 2011 NAFCON News Release.  (Pl. Ex.

11.)  The January 14, 2011 Philippines Today Article is a republication of the January 7, 2011

Mabuhay Radio Article.  (Pl. Ex. 12.)

    The January 21, 2011 Balitang America Article quotes Plaintiff's counsel as stating that

"The owners of the agency knew that they didn't have the financial capability" to sponsor

Plaintiff, but they misrepresented their financial capacity to Plaintiff, "who actually became a

one woman staffing agency for them."  (Pl. Ex. 14.)  The article also quotes Plaintiff as saying

that "Because of the two of you — De Castro and Jordan — I lost my legal status, I tried to fix

everything, I paid for my own lawyer, thank God I was able to pay for the fees involved."  (*Id.*)

The January 22, 2011 Pinoy-OFW.com Article is identical to the January 21, 2011 Balitang

America Article.  (Pl. Ex. 15.)  The January 22, 2011 GMA News Article states that Plaintiff and

---

[18]  Plaintiff testified during her deposition that she participated in a press conference called by her attorney in January 2011.  (Pl. 56.1 ¶ 66; Defs. 56.1 ¶ 66; Pl. Dep. 133:22–134:7.) It appears that the out of court statements attributed to Plaintiff and her attorney in these six articles were made during the January 2011 press conference.

Moratal described their experiences at a press conference in which NAFCON "vowed to assist the two in their legal battle."  (Pl. Ex. 16.)  Plaintiff is quoted as stating "Some people say I should just go back home to the Philippines or I should just hide from the authorities, but why should I?  I know I never did anything wrong."  (*Id.*)

Based on the articles submitted by Defendants, the out of court statements made by Plaintiff and Plaintiff's counsel "constitute substantially accurate descriptions and characterizations of the Complaint."  *D'Annunzio*, 876 F. Supp. 2d at 220; *see Hudson v. Goldman Sachs & Co.*, 757 N.Y.S.2d 541, 542 (App. Div. 2003) (affirming dismissal of plaintiff's defamation claim based on statements made by defendant in a newspaper article before defendant served its answer, where the statements were a substantially accurate description of defendant's position in the lawsuit); *see also Gristede's Foods*, 2009 WL 4547792, at *16 (stating that Civil Rights Law § 74 extends to "comments made by attorneys to the press in connection with representation of their clients" (quoting *McNally v. Yarnall*, 764 F.Supp. 853, 856 (S.D.N.Y. 1991)).  Defendants assert that Plaintiff's statements accusing them of "human trafficking" are inaccurate and defamatory.  (Am. Answer with Am. Counterclaim, Counterclaim ¶¶ 6, 66.)  However, the statements made by Plaintiff and Plaintiff's counsel that appear in these articles accurately reflect the allegations in the Complaint.  *See McRedmond*, 851 N.Y.S.2d at 480 (holding that the allegedly defamatory statements that appeared in various news articles and Web sites relating to the litigation were protected by Civil Rights Law § 74 because, with one exception, they "essentially summarize[d] or restate[d] the allegations of the complaint"); *see also Silver*, 2005 WL 2990642, at *16 (dismissing defamation claim based on a statement made by defendant that was quoted in a *New York Post* article, because, although plaintiff contended that defendant's statement contained inaccuracies, "in view of the entire

48

article in which [defendant's] statement appeared," defendant's statement "was a substantially

accurate account" of his client's position in the litigation").

Plaintiff has brought two TVPRA claims, one for forced labor and the other for

trafficking, against Defendants, alleging that "Defendants used fraudulent misrepresentations,

veiled threats and intimidation to hold Plaintiff in their employment and forced her to work

without paying her the compensation required by law."  (Compl. ¶ 75.)  The original Trafficking

Victims Protection Act of 2000 was passed to "combat trafficking in persons," H.R. Conf. Rep.

No. 106-939, at 3 (2000), and the Trafficking Victims Protection Reauthorization Act of 2008

was enacted to "enhance measures to combat trafficking in persons," Pub.L. No. 110–457, § 221,

122 Stat. 5044, 5067 (2008).  Violations of the TVPRA are often referred to as "human

trafficking."  *See, e.g.*, *Tanedo v. E. Baton Rouge Parish Sch. Bd.*, No. 10-CV-1172, 2012 WL

5378742, at *3 (C.D. Cal. Aug. 27, 2012) (referring to alleged violations of § 1589 as "alleged

acts of human trafficking by forced labor"); *Swarna v. Al-Awadi*, No. 06-CV-4880, 2011 WL

1873356, at *4 (S.D.N.Y. May 12, 2011) (stating that a person who violates §1590 "is guilty of

trafficking"); *see also Kiwanuka v. Bakilana*, 844 F. Supp. 2d 107, 115 (D.D.C. 2012)

("Congress . . . added 18 U.S.C. §§ 1589 and 1590 to address the increasingly subtle methods of

traffickers who place their victims in modern-day slavery . . . .").  The statements made by

Plaintiff and Plaintiff's counsel do not suggest misconduct more serious than that alleged in the

Complaint.  *Geiger*, 311 F. App'x at 417 (holding that a newspaper publisher's report was not

defamatory because, although it used more colorful language than the official proceeding, it did

not "suggest more serious conduct than that actually suggested in the official proceeding");

*D'Annunzio*, 876 F. Supp. 2d at 220 (finding that the plaintiffs' statements and distribution of

copies of the complaint to the media were protected by Civil Rights Law § 74 because, "as

49

evidenced by a comparison of the alleged defamatory statements to the plain language of the

[c]omplaint, [p]laintiffs provided a fair and accurate report of the judicial proceedings" and did

not suggest "more serious conduct"); *Gristede's Foods*, 2009 WL 4547792, at *16 (holding that

statement made by plaintiff's attorney to *Newsday* that suggested that defendants were involved

in the black market was protected by Civil Rights Law § 74 because the suggestion was

"identical to the allegations in the underlying litigation," and the statement did not imply that the

defendants "engaged in any misconduct other than that already alleged in the complaint"); *Fuji*

*Photo Film U.S.A., Inc. v. McNulty*, 669 F. Supp. 2d 405, 415 (S.D.N.Y. 2009) (dismissing

plaintiff's defamation claim based on distribution of a memorandum to defendant's employees,

because the allegedly defamatory statements in the memorandum did not imply that defendant

"engaged in any misconduct other than that alleged in the [c]omplaint," and the remaining

statements "either quote[d] directly from or fairly summarize[d] the allegations in the

[c]omplaint" (footnote omitted)); *McRedmond*, 851 N.Y.S.2d at 478 (holding that allegedly

defamatory statements appearing in various news articles and Web sites essentially summarized

or restated the allegations of the complaint and were therefore protected by Civil Rights Law

§ 74).  Therefore, Defendants cannot maintain a defamation claim based on these articles.

Plaintiff's motion for summary judgment as to Defendant's defamation counterclaim is

granted.

### c.   Defendants' Motion for Judgment on the Pleadings

#### i.   TVPRA Claims — De Castro and Jordan

Plaintiff can maintain her TVPRA claims against De Castro and Jordan in their individual

capacity because § 1595 provides for individual liability.  Section 1595 specifically states that

"[a]n individual who is a victim of a violation [of the substantive provisions of the TVPRA] may

bring a civil action against the perpetrator (or whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter) in an appropriate district court of the United States and may recover damages and reasonable attorneys fees."  18 U.S.C. § 1595. De Castro and Jordan hired Plaintiff to work at Best Care.  Plaintiff alleges that De Castro and Jordan forced her to work for Best Care at a reduced salary, threatened to withdraw Best Care's sponsorship if she left, and represented that they had the ability to sponsor her.  In addition, De Castro and Jordan are the only two owners of the corporation, and, therefore, benefited financially from Plaintiff's employment.  Plaintiff has sufficiently alleged that De Castro and Jordan either perpetrated or "knowingly benefit[ed]" from her alleged forced labor and involuntary servitude.  *See, e.g., Nunag-Tanedo*, 790 F. Supp. 2d at 1143 (allowing TVPA claims to proceed against two recruiting companies, the owner of the first company, and the official representative of the second company, where the two individuals allegedly threatened plaintiffs); *see also Camayo v. John Peroulis & Sons Sheep, Inc.*, No. 10-CV-00772, 2012 WL 4359086, at *5 (D. Colo. Sept. 24, 2012) (allowing claims against employer and the individuals who recruited and threatened plaintiffs to go forward); *Catalan v. Vermillion Ranch Ltd. P'ship*, No. 06-CV-01043, 2007 WL 38135, at *8 (D. Colo. Jan. 4, 2007) (claims against employer and owners).  Defendants' motion for judgment on the pleadings as to the TVPRA claims against De Castro and Jordan is denied.

### ii.  State Law Claims — De Castro and Jordan

Defendants claim that Plaintiff cannot maintain her fraudulent inducement and negligent misrepresentation claims against De Castro and Jordan because De Castro and Jordan were acting on behalf of Best Care, and Plaintiff cannot pierce the corporate veil.  (Defs. Mem. 13–

14.)  Generally, under New York law, officers of a corporation are not liable for corporate debts

or breaches of contract unless the corporate veil is pierced.  *Cohen v. Koenig*, 25 F.3d 1168, 1173

(2d Cir. 1994) (citing *We're Assocs. Co. v. Cohen, Stracher & Bloom, P.C.*, 65 N.Y.2d 148, 151

(1985)); *see also Banks v. Corr. Servs. Corp.*, 475 F. Supp. 2d 189, 197 (E.D.N.Y. 2007) (citing

*Cohen*, 25 F.3d at 1173; *Puma Indus. Consulting, Inc. v. Daal Assocs., Inc.*, 808 F.2d 982, 986

(2d Cir. 1987)).  However, corporate officers may be held personally liable for their tortious acts,

including intentional and negligent misrepresentation, even if they are made on behalf of the

corporate entity.[19]  *Liberty Mut. Ins. Co. v. Palace Car Servs. Corp.*, No. 06-CV-4881, 2007 WL

2287902, at *3 (E.D.N.Y. Aug. 8, 2007); *see also Universe Antiques, Inc. v. Vareika*, No. 10-

CV-3629, 2011 WL 5925012, at *1 (S.D.N.Y. Nov. 16, 2011) (in connection with plaintiff's

fraudulent inducement claim, "corporate officers are individually liable for their fraudulent

misrepresentations, even if made on behalf of the corporate entity" (citing *Cohen*, 25 F.3d at

1173)); *Model Imperial Supply Co. v. Westwind Cosmetics, Inc.*, 808 F. Supp. 943, 946

(E.D.N.Y. 1992) (dismissing individual defendants' motion for summary judgment on plaintiff's

---

[19]  Defendants rely on *Gartner v. Snyder*, 607 F.2d 582 (2d Cir. 1979), to support their
argument that De Castro and Jordan are not individually liable.  (Def. Mem. 14.)  In *Gartner*, the
Second Circuit reversed the judgment of the district court which held the principal of a
corporation personally liable for the breach of the corporation's contract to sell real property.
*Gartner*, 607 F.2d at 583.  *Gartner* concerned a breach of contract claim, and therefore does not
support Defendants' claim that De Castro and Jordan cannot be personally liable to Plaintiff on
her fraudulent inducement or negligent misrepresentation claims.  Although officers and
directors "are not generally liable for their corporation's debts or its breach of a contract,
'[o]fficers and directors of a corporation may be held liable for fraud if they participate in it or
have actual knowledge of it . . . .'" *Cohen v. Koenig*, 25 F.3d 1168, 1173 (2d Cir. 1994) (citation
omitted) (quoting *People v. Apple Health & Sports Clubs, Ltd.*, 80 N.Y.2d 803, 807 (1992))
(status of defendants as corporate officers and directors did not provide a basis for dismissing
plaintiffs' fraud claim where plaintiffs alleged that the defendants themselves made
misrepresentations); *see Nielsen Co. (US), LLC v. Success Sys., Inc.*, No. 11-CV-2939, 2012 WL
3526625, at *6 (S.D.N.Y. Aug. 13, 2012) (officers and directors of a corporation "may be held
individually liable if they participated in or had knowledge of the fraud, even if they did not
stand to gain personally" (quoting *Buy This, Inc. v. MCI Worldcom Communic'ns, Inc.*, 209 F.
Supp. 2d 334, 342 (S.D.N.Y. 2002))).

negligent misrepresentation claim on the grounds that "[c]orporate officers and employees may be held personally liable for personal torts committed in the performance of their duties to the corporation").  Defendants' motion for judgment as to De Castro and Jordan is denied as to the state law claims.

### III.   Conclusion

For the foregoing reasons, Plaintiff's motion for summary judgment is denied as to Plaintiff's claims but granted as to Defendants' counterclaim.  Defendant's motion for judgment on the pleadings is denied.

SO ORDERED:

_____s/ MKB_____
MARGO K. BRODIE
United States District Judge

Dated: August 16, 2013
        Brooklyn, New York